The TRAVELERS INDEMNITY COMPANY, Appellant (Defendant Below),

v.

Orrie L. ARMSTRONG, Appellee (Plaintiff Below).

No. 1282S468.

Supreme Court of Indiana.

Dec. 6, 1982.

Locke, Reynolds, Boyd & Weisell by Hugh E. Reynolds, Michael A. Bergin, Indianapolis, Hoeppner, Wagner & Evans by John E. Hughes, Lowell, Clifford, Houran, Hiller & Sullivan by Winfield Houran, Valparaiso, for appellant.

Knightlinger, Young, Gray & De Trude by Mark W. Gray, Peter G. Tamulonis, Indianapolis, for American Ins. Ass'n, amicus curiae.

John D. Hughes, George Segar, Ice, Miller, Donadio & Ryan, Indianapolis, for Indiana Basic Property Ins. Underwriting Ass'n (Fair Plan), amicus curiae.

George W. Douglas, James H. Douglas, Valparaiso, for appellee; Douglas, Douglas & Douglas, Valparaiso, of counsel.

Gleason & Hay by Charles S. Gleason, Indianapolis, for William Damaskos and Alice Damaskos, Patton Elec. Co., Inc., George Nasser d/b/a Chairs Galore, Individually and in their representative capacity for all other policyholders similarly situated, amicus curiae.

PRENTICE, Justice.

The defendant issued its policy of insurance denominated a "Farmowner's Policy," by the terms of which it insured the plaintiff, as follows:

" * * * does insure the insured named * * * to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality * * * against all direct loss by fire * * *."

The contract (policy) consisted of the basic form known in the industry as "The 1943 New York Standard Form" and also as an "Actual Cash Value Form," which was approved for use in Indiana in 1955. Burns Adm. Rules and Regulations, (27–1–13–1) and three addenda, termed "Endorsements."

The property and interests insured were enumerated in the basic form as "Coverages." Coverage "A" was the defendant's farm residence, and Coverage "F" was another dwelling house, rented to tenants, and located upon the same farm, which encompassed some 190 acres in Lake County. The limit of liability was fixed at $15,000.00 as to the rental house, which was approximately 100 years old but to which extensive renovations had been made about ten years prior to the fire which gave rise to the controversy.

The rental dwelling was substantially damaged by fire October 17, 1972. The plaintiff and Mr. Bognar, an employee of the defendant, met promptly thereafter and surveyed the damaged premises with a repair contractor, who estimated the cost of

restoration to be $8,729.62. A dispute arose between the parties at this point, the details of which are immaterial to a resolution of the issue of compensatory damages but will be hereinafter related in that portion of this opinion devoted to the issue of punitive damages.

Upon receiving the aforementioned repair estimate, Defendant offered the sum of $6,497.22 after allowing for the enhancement, over the original value, that would result from the restoration of the dwelling. This factor is termed "depreciation" and was assessed at twenty-five percent. The issue was entirely one of law, i.e., whether the phrase "actual cash value," as used in the contract of insurance, obligated the defendant to pay the full cost of restoration or merely the amount of diminution in value occasioned by the fire.

The case was tried to a jury which returned a verdict upon the contract in the sum of $8,729.62 and punitive damages in the sum of $25,000.00, and judgment was rendered thereon.

The Court of Appeals, Third District, affirmed the judgment of the trial court by decision and opinion published at 384 N.E.2d 607, but in so doing contravened a ruling precedent of this Court, i.e., *Vernon Fire & Casualty Insurance Co. v. Sharp,* (1976) 264 Ind. 599, 349 N.E.2d 173, wherein this Court held that punitive damages may be assessed where the conduct of a party breaching a contract not only amounts to a breach but also is intentional and oppressive and not privileged, as relating to his duties under the contract, and further held that an insurer could not be subjected to punitive damages for seeking to pay only the amount which it believes, in good faith, to be lawful.

Said decision and opinion of the Court of Appeals also erroneously decided a new question of law in this state[1] in that it construed the phrase "actual cash value," as used in the 1943 Standard Form New York policy of casualty insurance, approved for use in this state by the Indiana Insurance Commission, to mean "an amount of money,

within the policy limit, sufficient to restore, repair, or replace the property destroyed."

Transfer is granted, and the aforementioned decision and opinion of the Court of Appeals, Third District, is ordered vacated.

## COMPENSATORY DAMAGES
### (Broad Evidence Rule Adopted)

The insurance industry provides two distinct types of casualty protection for dwellings. One insures to the extent of the "actual cash value," i.e., the diminution in value; and the other insures to the extent of "the full cost of repair or replacement without deduction for depreciation," i.e., without regard to whether or not the restoration results in an enhanced value to the premises. This is an overly simplified explanation but adequate for purposes of resolving this case. Under some circumstances the amount payable following a loss may be the same under either insuring provision, but the risk assumed by the insurer and consequently the premiums charged are quite different.

### ACTUAL CASH VALUE AND REPLACEMENT COST DISTINGUISHED

The difference between "actual cash value" coverage and coverage for "the full cost of repair or replacement without deduction for depreciation" is not only a linguistic one but also each provides a different practical result.

The actual cash value policy is a pure indemnity contract. Its purpose is to make the insured whole but never to benefit him because a fire occurred. *Appleman on Insurance 2d* § 3823 at pp. 218–219; *Brand Distributors Inc. v. Insurance Co. of North America,* (1976) 532 F.2d 352 (4th Cir.). Replacement cost coverage, on the other hand, reimburses the insured for the full cost of repairs, *if he repairs or rebuilds the building,* even if that results in putting the insured in a better position than he was before the loss.

If a fire occurs in a new building, the actual cash value generally is equiva-

---

1. This question was decided by our Court of Appeals, Second District, subsequent to the time this opinion was prepared but prior to its filing. *See The Ohio Casualty Insurance Company v. Ramsey, et al.,* (1982) Ind.App., 439 N.E.2d 1162, now pending on petition to transfer.

lent to the cost of repairs since the full cost of repair merely restores what was there. It indemnifies but does no more. If an old building burns to the ground, the actual value is commonly established by reference to its fair market value less the value of the land on which the building sits. If an old building has only very minor fire damage, repairs probably do not result in a substantial betterment, and depreciation is usually ignored in adjusting the loss. However when the building is old or obsolescent and is seriously damaged but not destroyed, the actual cash value is more likely to be disputed. The courts uniformly hold, as did the Court of Appeals, that actual cash value insurance is strictly a contract of indemnity. The insured should be made whole but not be put in a better position than he was in before the fire. *Braddock v. Memphis Fire Ins. Corp.,* (1973) Tenn., 493 S.W.2d 453.

"A problem common to all the foregoing tests is the extent to which physical deterioration and obsolescence should be taken into account in computing loss. If the principal of indemnity be adhered to, depreciation must be considered in loss adjustment so that the insured will not receive the equivalent of a new building for a loss of the old one. Insurance law is not concerned with the estimated depreciation charged off on the books of business establishment but rather with the actual deterioration of a structure by reason of age and physical wear and tear, computed at the time of the loss." 49 Colum.L.R., 818, 823. The same principle is discussed at 44 Am.Jur.2d 549, *Appleman on Insurance 2d,* § 2823 at p. 226.

A building constructed thirty years ago will have many interior features and structural components that are not only old and used, but of a style, material and color no longer available or in fashion. If damaged by a fire, they will be replaceable only with new components and the fire will be the occasion of renovation and remodeling which, if done without reference to a fire, would be an improvement paid for by the owner. 44 Am.Jur.2d p. 549. In such event, the property is worth more and the fire loss provided the insured with an enhancement for the value of his assets.

Replacement cost insurance on the other hand is not a pure indemnity agreement. It is an optional coverage that may be purchased and added to a basic fire policy by endorsement. It is more expensive because the rate of premiums is higher and the amount of insurance to which that rate applies is usually higher.

Replacement cost coverage is available on the insurance market to meet the need which troubled the plaintiff. That need may be expressed this way:

Since fire is an unwanted and unplanned for occurrence, why can't the owner of an older home buy insurance to cover the full cost of repair even if those repairs make it a better or more valuable building? Since at the time of fire the homeowner may be least able to pay for improvements, why can't that hazard be insured too? Instead of apportioning the cost of repair after a fire between the actual cash value, to be paid by the insurer, and the betterment to be paid by the insured, why can't the policyholder simply pay a higher premium each year but not have to pay anything more to have his home fully repaired in the event of fire?

When the insurance industry adopted a standard extension of coverage endorsement to provide replacement cost, it took into account the one great hazard in providing this kind of coverage: the possibility for the insured to reap a substantial profit, if fire occurs. *See Higgins v. Insurance Co. of North America,* (1970) 256 Or. 151, 469 P.2d 766, 66 A.L.R.3d 871 and the annotation beginning at 66 A.L.R.3d 886.

The cost of repair may exceed the fair market value of the building, and in the case of very old or obsolescent buildings, the difference may be very substantial. To permit recovery of the cost of repair, without also requiring the repairs to be made usually provides an even greater windfall than is provided when repairs are made. In effect the insured sells his building not at its market value but at a much higher figure and for cash.

The basic insurance contract with which we are here concerned provided for "actual cash value" reimbursement. By addenda, commonly referred to as the extended coverage endorsement, (Endorsement FO–2) the extent of reimbursement was modified to provide for "replacement cost" reimbursement or "actual cash value" reimbursement, whichever was the greater. This provision of the addenda, however, was expressly applicable only to "Coverage A," the plaintiff's personal residence and not to "Coverage F," the rental dwelling which incurred the fire damage. The amount that the defendant was obligated to pay under the contract, accordingly, is determined by the language of the basic policy, "actual cash value."

Although there are two cases from other jurisdictions, *Fedas v. Insurance Co. of State of Pennsylvania,* (1930) 300 Pa. 555, 151 A. 285 and *Glens Falls Ins. Co. v. Gulf Breeze Cottages,* (1949) Fla., 38 So.2d 828 holding, in effect, that an agreement to pay "actual cash value" requires the insurer to repair or replace the property as nearly as possible to its condition as of the date of the casualty, the vast weight of authority and better reasoned case law is to the contrary.

Neither this Court nor our Court of Appeals has construed the term "actual cash value" as used in insurance contracts,[2] although there are decisions from the latter that are consistent with the defendant's position that depreciation is a factor when determining the loss payable upon a contract insuring such value. *Meridian Ins. Co. v. McMullen,* (1972) 152 Ind.App. 141, 145, 282 N.E.2d 558, 561. And in *Atlas Construction Co., Inc. v. Indiana Ins. Co., Inc.,* (1974) 160 Ind.App. 33, 40, 309 N.E.2d 810, 814, "actual cash value" was equated with fair market value; and it was recognized that it was a thing apart from replacement cost.

The contract provision was as follows:

"In consideration of the provisions * * *, this company, * * *, to an amount not exceeding the amount(s) above specified, does insure the Insured named * * *, *to the extent of the actual cash value* of the proper-

2. See note 1 above.

ty at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality, * * *, against all direct loss by fire, * * *." (Emphasis added).

Under the foregoing insuring agreement, the defendant was obligated to pay for plaintiff's direct loss, limited, however by three factors: (1) the amount expressly provided, $15,000.00, (2) the actual cash value of the property lost, and (3) the cost of repair or replacement, etc. The Court of Appeals, however, regarded limit (2) and limit (3) as being one and the same which, in effect, eliminated No. (2) as a limiting factor. It also failed to take into account that depreciable components would, of necessity, be replaced with new ones hence resulting in a restored building and a value greater than that existing before the loss. By way of example, if a fire damages the roof of a building to the extent that replacement is required, it makes a vast difference, in determining the loss, whether the roof was new or near the end of its usable life. If the former, replacement of the damaged roof only indemnifies the owner but if the latter, replacement would be a substantial windfall to the owner.

The difference between factors No. 2 and No. 3, is that No. 2, according to the weight of authority, permits a reduction in liability in view of the very real consideration that following complete restoration of an extensively damaged building, the building will often be worth more than it was before the loss occurred. The degree to which this comes into play obviously varies with the physical condition and degree of obselescence of the building, prior to the loss, and the extent of the damage insured against. The determination is further complicated by reasons of factors, other than mere age or physical deterioration, that also affect values.

Historically, four methods have been judicially sanctioned for determining the *actual cash value* of losses under policy provisions the same or similar to the one with which we are here concerned. Three of these are described and annotated at 61

A.L.R.2d 711, 725, (§ 7. Buildings). Not recognized in the annotation is the one utilized by the Court of Appeals, although it appears to have been approved in *Fedas v. Insurance Co. of State of Pennsylvania, supra*, and *Glens Falls Ins. Co. v. Gulf Breeze Cottages, supra*.

(1) *Replacement cost, without deduction for depreciation*. The method utilized by the Court of Appeals, has been criticized as follows:

"The most striking development in the partial loss cases has been the emergence of a minority view that recovery may be had for the cost of reconstruction without any depreciation allowance. The rationale of these cases is that if a depreciation deduction is taken, the insured will realize a sum that is insufficient to pay for repairing the property at the time of the loss. Where the damage is to a substantial portion of the structure, the repair of which would appreciably extend the normal life of the building, recovery of full repair cost would permit the insured to profit by his loss since he is thereby receiving the cost of a new building for an old building. Where, on the other hand, the damaged portion is structurally insignificant, the failure to consider depreciation is justifiable." 49 *Colum.L.Rev.* 818, 826.

Even when that article was written in 1949, the hazard of windfall profit was recognized. Footnote 60 states:

"Since depreciation is always deducted in computing total loss (see notes 37–40, supra.), an insured may recover more for a partial loss under this minority rule than for a total loss. Thus, if the insured has a building valued at $100,000 which has depreciated $20,000, he would recover $80,000 in a case of total loss. If his loss was $90,000 under this minority view, he would collect the full $90,000." *Id.*

(2) *The market value test* has been adopted in relatively few jurisdictions, the most prominent being California. *Jefferson Ins. Co. of New York v. Superior Court of Alameda County*, (1970) 3 Cal.3d 398, 90 Cal.Rptr. 608, 475 P.2d 880. In the case of partial damage or destruction of a building by fire, it is speculative, since there may be no established market. The rule has been criticized in this way.

"It is commonly said that a building has no recognized market value in the ordinary sense since each structure is in theory unique. Further, the market value of its structure is bound up with the value of the land on which it stands and if the land is not marketable the building will have a decreased value. The majority of the courts, therefore, have rejected market value as the sole definition or standard of 'actual cash value', but have allowed juries to consider it as a factor in computing the actual cash value of a building." 49 *Colum.L.Rev.* 818, 820.

(3) *The replacement cost with deduction for depreciation* used to be the majority rule.

"At least fourteen jurisdictions have adopted the reproduction or replacement—cost less—depreciation standard of measuring the actual cash value. The New York Standard Fire Insurance Policy says recovery shall not exceed 'the amount which it would cost to repair or replace the property with material of like kind and quality . . .'"

"This provision is acknowledged to have been intended as an upper limit of the insured's recovery, but courts have generally adopted it as the rule of measurement of actual cash value in those states using replacement cost method. Its primary advantage is that of certainty but the inflexibility of the rule is also its most objectionable feature. It results in overcompensation in those cases where substantial obsolescence has taken place apart from corresponding depreciation." Insur.L.J., July, 1973, p. 368.

The replacement cost with deduction for depreciation has been described by its adherents as follows:

"Of the three rules generally applicable to partial losses, the one that squares with the basic principal of indemnity and affords a reasonable guide to insureds in determining insurable value and to insurers in determining the amount of loss is

replacement cost less depreciation, with depreciation given its broad meaning as exemplified in the *McAnarney* case in situations where obsolescence is a material factor." Ins.L.J., 1953, 685, 688.

It, nevertheless, cannot always be said that the insured has been "indemnified" if he is required to expend a substantial sum from his own pocket to restore his building, albeit to an improved condition, when it suited his purpose in its pre-loss condition. (4) The fourth method that has been employed is the so-called *Broad Evidence Rule* which originated with the case of *McAnarney v. New York Fire Insurance Company,* (1928) 247 N.Y. 176, 159 N.E. 902.

The *Broad Evidence Rule* has now become the majority rule, having been adopted in at least twenty-three states.

"More than twenty-three states have adopted some form of the broad evidence rule. It is clear that obsolescence cases like the early *McAnarney* case and demolition and abandonment of building cases have been responsible for most breaking of traditional valuation rules. These appear to be the primary areas where existing doctrines simply could not be stretched enough to meet indemnity and equity principles." Insur.L.J., 1973 at p. 369.

. The fourth approach, the *Broad Evidence Rule,* instead of being a fixed rule, is a flexible rule. It permits an appraiser or a court or a jury to consider any relevant factor.

An excellent analysis of these various rules was set forth recently by the Supreme Court of New Jersey in *Elberon Bathing v. Ambassador Ins.,* (1978) 77 N.J. 1, 389 A.2d 439. The court there considered the same fire policy involved in this case.

In New Jersey the 1943 New York Form had been adopted by statute. The "replacement cost extended coverage endorsement, approved for use in Indiana by the Indiana Insurance Commission, had also been expressly approved in New Jersey, by statute. The Supreme Court of New Jersey expressly held that these provisions, when con-

sidered together, prohibited an award simply based on replacement cost without consideration for depreciation where the policy covered only actual cash value and not replacement cost. It did not, however, say that the amount constituting actual cash value was necessarily equal to the cost of repair less deduction for depreciation. Instead it adopted the *Broad Evidence Rule.* It is a significant and scholarly opinion. It is a unanimous opinion. It reviews in detail the interplay between *actual cash value coverage and replacement cost insurance.* It specifically considers the fixed measures of replacement cost, market value, and replacement cost less depreciation. It expressly considers the problem of total loss and partial loss, the effect of over and under insurance, and the applicability of principals of valuation to both old and new structures. After a thorough analysis of the problems inherent in all of the standards for determining actual cash value, the court expressly adopted the *Broad Evidence Rule* quoting it from *McAnarney, supra,* as follows:

" 'Where insured buildings have been destroyed, the trier of fact may, and should, call to its aid, in order to effectuate complete indemnity, every fact and circumstance which would logically tend to the formation of a correct estimate of loss. It may consider original cost and cost of reproduction; the opinions upon value given by qualified witnesses; the declarations against interest which may have been made by the insureds; the gainful uses to which the buildings might have been put, as well as any other fact reasonably tending to throw light upon the subject. 159 N.E. at 905.' "

"*McAnarney* was intended to insure application of the principal of indemnity (i.e., to make the measure of recovery for fire insurance losses correspond to the actual pecuniary loss sustained by the insured'). *Id.* [159 N.E.] at 904–905 See *Bonbright and Catz,* op. cit., *supra,* 29 Colum.L.Rev. at 899. Under valuation denies the insured the indemnification due him under the policy. Over valuation tempts the insured to cause the very loss

covered, or at least, to provide inadequate safeguards against the loss. Id. at 863."

"The commentator's generally view the broad evidence rule with approval. See Id. at 898–899 (a flexible test which can be modified in such a way as to accord more nearly with the principal of indemnity); *Cozen* op. cit., supra, 12 Forum at 657 (Sacrificing an easily applied standard for a far more equitable result). It has been adopted in numerous jurisdictions."

"We find the rationale of the broad evidence rule to be compelling. It requires the fact-finder to consider all evidence an expert would consider relevant to an evaluation, and particularly both fair market value and replacement cost less depreciation. If the appraiser finds it appropriate under the particular circumstances he may, after weighing both factors, settle on either alone." 77 N.J. 1, 389 A.2d 439, 443–444.

This is a sound rule of law and was given tacit approval by our Court of Appeals in *Atlas Construction Co. Inc. v. Indiana Insurance Company,* supra.

Defendant challenges the award of compensatory damages as being unsupported by the evidence, contrary to the evidence, and contrary to law. These challenges present common questions of law.

It is Defendant's claim that it was entitled, as a matter of law, to have the actual cash value of the loss determined by the aforementioned *replacement cost with deduction for depreciation* method. However, it acknowledges that the question has not been previously determined in this state and relies upon cases from other jurisdictions, citing *Braddock v. Memphis Fire Insurance Corporation,* (1973) Tenn., 493 S.W.2d 453. As previously stated, this used to be the majority rule, but has since lost out to the *broad evidence rule* method which did not control the decision but, as previously mentioned, was looked upon favorably by our Court of Appeals in *Atlas Construction Company v. Indiana Insurance Company, Inc.,* supra. We hold, therefore, that although Defendant was entitled to

have the element of depreciation considered, it was not entitled to have its liability determined by the exclusive use of that method.

Plaintiff testified that the value of the house immediately before the fire was at least $15,000.00 and that immediately after the fire it was $5,000.00, thus fixing the loss at $10,000.00. She also presented an expert witness who testified that the damage to the house was $8500.00, based upon the estimated cost of necessary repairs.

Defendant's evidence was that the estimated cost of repairs was $8729.00 but that the house was 50% depreciated, due to its age. It further gave evidence that its initial offer was incorrect and arose from erroneously applying the extended coverage endorsement terms to the damaged house, hence the alternative offer to pay a greater amount if the premises were restored. It further gave evidence that after the dispute arose, it increased its offer by applying a 25% factor, in an effort to "keep everybody satisfied."

■ Under the broad evidence rule, the parties were entitled to introduce evidence of "every fact and circumstance which would logically tend to a formation of a correct estimate of the loss." *McAnarney, supra;* under the evidence presented, the jury was at liberty to award as much as $10,000.00, based upon Plaintiff's before and after valuation or as little as $4,250.00, based upon her expert's testimony of repair costs of $8,500.00 and a depreciation factor of 50%, as presented by Defendant's evidence. The verdict was within the limits of the evidence and cannot be disturbed.

## INSTRUCTION

(Disapproved—No Reversible Error)

Over Defendant's objection, the court gave the following instruction:

"You are instructed that insurance policy in question bound and required the defendant to pay the full direct loss resulting from a fire to the house in question within the stated limits of the policy, namely $15,000. There are no provisions

in the policy applicable to the tenant house that was damaged which either required or authorized the insurance company to reduce the amount payable under the contract below such an amount."

Defendant argues that the instruction implied that no deduction for depreciation could be made in arriving at the amount of Plaintiff's loss and that "In refusing to modify the instruction to include language to the effect that cost of repairs—less—depreciation is a proper measure of loss, the court deprived the jury of a full and correct statement of the law on the issue of determining compensatory damages."

 We do not agree that the instruction implied that no deduction could be made by the jury for depreciation. It provides that there are no provisions in the policy authorizing or requiring the defendant to deduct depreciation, unilaterally. We do not approve the instruction because it is subject to the erroneous inference that no deduction could be made. However, the defendant tendered no instruction of its own, and the court did not refuse to modify the instruction, as no modification was tendered. *Law v. State,* (1980) Ind., 406 N.E.2d 1185. Furthermore, the tenor of the in-court objection was that a deduction for depreciation was mandatory, as a matter of law, under the terms of the policy. Error urged on appeal must be the same as that urged at the trial. *Tyler v. State,* (1968) 250 Ind. 419, 236 N.E.2d 815; *Rector v. State,* (1971) 256 Ind. 634, 271 N.E.2d 452.

## PUNITIVE DAMAGES

### (Clear and Convincing Evidence Standard Adopted)

At the close of all the evidence, the defendant moved for judgment on the evidence upon the issue of punitive damages; and we turn now to a consideration of that issue.

As hereinbefore related, the dispute between the parties arose over the monetary extent of the defendant's liability under the contract. Also, as hereinbefore determined, the issue was one of law, not of fact, and

the law was unsettled in this state. It is, therefore, difficult to imagine circumstances more repugnant to an award of punitive damages.

In *Vernon Fire & Casualty Insurance Co. v. Sharp,* (1976) 264 Ind. 599, 349 N.E.2d 173, this Court first recognized that an award of punitive damages could be upheld in contract actions, even though the facts would not support an independent action in tort, *"when it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed * * *."* and *"that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of the wrongdoer and parties similarly situated."* 264 Ind. at 608, 349 N.E.2d 173. (Emphasis added). It was pointed out that the evidence warranted the conclusion that Vernon's conduct was "intentional and wanton," "oppressive," and in no way "privileged and was "motivated by self interest," i.e., to extract from Sharp a consideration to which it was not entitled.

*Vernon* was followed by *Hibschman Pontiac, Inc. v. Batchelor,* (1977) 266 Ind. 310, 362 N.E.2d 845, in which we held that the evidence warranted a finding that malice, fraud, gross negligence, and oppressive conduct mingled in the breach of warranty.

While *Vernon, supra,* was pending on a petition for rehearing in this Court, our Court of Appeals, in *Jones et al. v. Abriani,* (1976) 169 Ind.App. 556, 350 N.E.2d 635, determined that the evidence supported a finding that Jones' conduct attending his breach had been "fraudulent and oppressive." 169 Ind.App. at 580, 350 N.E.2d 635, and in *Jos. Schlitz Brewing Co. v. Central Beverage Co.,* (1977) 172 Ind.App. 81, 359 N.E.2d 566, that Schlitz's conduct had been oppressive, and in bad faith, hence tortious in nature. 172 Ind.App. 103–04, 359 N.E.2d 566.

In all of the aforementioned cases, it was also determined that the evidence warranted a finding that the public interest would be served by the award of punitive damages.

But in *Prudential Ins. Co. v. Executive Estates et al.,* (1977) 174 Ind.App. 674, 369 N.E.2d 1117 and in *First Federal Savings & Loan Ass'n. v. Mudgett,* (1979) Ind.App., 397 N.E.2d 1002, our Court of Appeals reversed the awards of punitive damages, while affirming the awards of compensatory damages. In each of these cases, it was determined that the evidence did not sustain findings of elements of fraud, malice, gross negligence or oppression mingled with the breaches.

In *Vernon, supra,* the tortious conduct was economic duress—the refusal to pay or negotiate the insurance policy proceeds until the insured procured a release from an associate on an unrelated claim, a service to which the insurer was not entitled.

In *Hibschman, supra,* the breaching party concealed its breaches and deceived and verbally abused the customer, from which it was inferred that its actions were a deliberate attempt to delay performance and ultimately to escape liability through expiration of the warranty period.

*Jones v. Abriani, supra,* was another case of economic duress. Jones accepted a substantial payment upon the purchase price upon execution of a contract for a mobile home. Upon delivery of the home, which was defective in many respects, and upon Abriani's justified reluctance to accept it, Jones informed the Abrianis that if they did not accept the home they would forfeit their advance payment and simultaneously agreed to rectify the defects. The Abrianis accepted the home, believing that they had no choice, but the defects were never adequately rectified.

In *Schlitz, supra,* the brewer apparently desired, in its own interest, to terminate its contract with the distributor, which it could not do directly. Schlitz had sought to have all its distributors keep certain records but did not enforce the policy generally. Ultimately, it terminated its contract with the distributor, purportedly because of the distributor's failure to follow the record keeping policy, although it was not then enforcing such policy against other distributors similarly situated.

The bad faith and oppression of the breaching parties and the public interest in each of those cases is readily apparent. By contrast, *Prudential, supra,* and *First Federal Savings & Loan Ass'n., supra,* presented situations wherein it would be difficult, although not categorically unreasonable, to infer bad faith from the conduct of the appellants and public benefit from an award of punitive damages. Yet, under our "preponderance" standard, it was difficult to set aside the jury awards.

In *Prudential,* the mortgagor (Appellee) contended, and the jury agreed, that by reason of local custom and the special relationship of mortgagor and mortgagee, it was incumbent upon Prudential, when disbursing the mortgage proceeds to obtain complete releases from lienholders. The mortgagor had been refused permission to receive and disburse the mortgage funds, because it was Prudential's policy to handle such matters; whereupon, the mortgagor advised that it desired to be present at the closing. The mortgage documents were pre-signed by the mortgagor, who was assured by Prudential's agent that liens, etc. would be "taken care of."

The Mortgagor's representative, McCain, appeared for the closing, gave his card to the receptionist and announced his purpose in being present. Nevertheless, Prudential's closing attorney proceeded to complete the matter and did not see McCain until after the proceeds had been disbursed and the desired releases were not procured.

The Court of Appeals held that the evidence most favorable to the judgment resulted, at best, in liability based upon negligence, which it acknowledged might be characterized as *a heedless or reckless disregard of consequences* and, in turn, "more accurately characterized as a conscious and intentional wrongdoing better described by such words as oppression or malice." (Emphasis added), citing *Bob Anderson Pontiac, Inc. v. Davidson,* (1973) 155 Ind.App. 395, 400, 293 N.E.2d 232, 235. It stated that the trial court had erred in instructing that punitive damages could be awarded if the jury found that Prudential's wrongful acts

had been committed in *"a willful, or wanton disregard of the rights of "* the mortgagor. It then proceeded to state: "Rather the conduct supporting punitive damages must be of a more reprehensible character, e.g., malice, gross fraud, oppressive conduct, or *heedless disregard of the consequences."* *Prudential, supra,* 174 Ind.App. at 697, 369 N.E.2d 1117. We are left to wonder when a heedless or reckless disregard of the consequences will support an inference of oppression or malice so as to warrant an award of punitive damages and when it will not.

The court in analyzing cases where punitive damages were sustained upon evidence of conduct labeled by the court as the heedless disregard of consequences, said that in those cases, "a more conscious and direct type of behavior was nevertheless included." *Prudential, supra,* 174 Ind.App. at 698, 369 N.E.2d 1117. Thus we are inclined to believe that the court was struggling with a factual situation susceptible of producing alternative inferences, one warranting punitive damages and the other not. The issues produced by the punitive damages concept are inherently issues of degree, i.e. was the conduct slightly negligent, negligent, very negligent, grossly negligent, wanton or heedless? Was the conduct malicious or merely inconsiderate or impolite? Was the relationship one of trust giving rise to a duty or was it merely one of unilaterally imposed reliance? Or was the consideration sought slight, reasonable, high, excessive, exorbitant or unconscionable?

In *First Federal, etc., supra,* the appellant acknowledged that it had breached the loosely drawn contract to make repairs to the residence which it sold to the appellee, but the Court of Appeals disagreed with the jury and with the trial judge in their conclusions that bad faith was inferable from evidence that the house had many more defects than those enumerated in the agreement, that the air conditioning unit was not only inoperable but was undersized and could not be rendered satisfactory and conflicting evidence as to whether the work was to be done to the satisfaction of the appellee or to the satisfaction of a competent third party. The court rather summarily held that the evidence did not rise to "the sufficiency required for punitive damages." *First Federal, supra,* at 1009. As in *Prudential, supra,* it made no attempt to articulate the level of evidence required or the shortfall. It found an absence of evidence upon a requisite element, and it made no mention of preponderance or weight.

We find no fault with the end result in these cases, but it becomes apparent, from them, that the advent of punitive damages in contract cases, absent evidence of an attendant full blown tort of a nature which would permit punitive damages in and of itself, has given rise to a need for the adoption of an evidentiary standard not heretofore required, lest the public policy favoring such awards be subverted.

"Clear and convincing" evidence, a stricter degree of proof than a mere preponderance of the evidence is required in some jurisdictions with respect to such issues as fraud, specific performance, forfeiture, etc. 30 Am.Jur.2d 344, Evidence § 1167.

"In ordinary civil actions a fact in issue is * * * sufficiently proved by a preponderance of evidence. However, clear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy, * * *.

"So, in a number of cases where an adverse presumption is to be overcome, or on grounds of public policy and in view of peculiar facilities for perpetrating injustice by fraud or perjury, the degree of proof required is expressed in such terms as 'clear,' 'clear and conclusive,' 'clear precise and indubitable,' 'convincing,' 'clear and convincing,' 'satisfactory,' 'entirely satisfactory,' 'strong,' 'clear, strong and convincing,' 'clear, distinct and convincing,' 'clear, positive and credible,' and 'unequivocal,' and *the phrase 'preponder-*

*ance of evidence' has been expressly disapproved as an insufficient measure of the proof required,* as has also the phrase, 'a fair preponderance of the evidence.' " 32A C.J.S. Evidence, § 1023, pp. 663–65. (Emphasis added) (Citations omitted).

Although we find no Indiana civil case in which the standard higher than the preponderance of the evidence has been clearly adopted, higher standards have been clearly recognized and perhaps subtly applied. This is particularly apparent in matters of equity. "Where the rights of a party are *clear* * * * a court of equity may properly issue a temporary or preliminary injunction." *Watson v. Burnett,* (1939) 216 Ind. 216, 224, 23 N.E.2d 420. (Emphasis added). "Here a mandatory injunction is prayed, which should be allowed in a proper case, but as a rule, courts will not grant an extraordinary remedy unless the complainant makes out a *clear* case." *Evansville, etc. Ry. Co. v. Evansville, etc., Ry.,* (1912) 50 Ind.App. 502, 514, 98 N.E. 649.

In another injunction case, this Court hinted that a preponderance of the evidence might not, in all cases, be sufficient.

"It is a familiar law, too familiar to need the citation of authority, that the decree of a chancellor is of grace, not of right, and that he is not bound to make a decree which will do far more mischief and work far greater injury than the wrong which he is asked to redress." (Citation omitted)

"Nor ought the process of injunction to be applied but with the *utmost caution.* It is the strong arm of the court, and to render its operation benign and useful, it should be exercised with great discretion, and only upon necessity." (Emphasis added) (Citation omitted)

"The principles upon which mandatory and prohibitory injunctions are granted do not materially differ. *Courts are, however, more reluctant in granting the mandatory writ."* (Emphasis added) *Schwartz v. Holycross,* (1925) 83 Ind.App. 658, 663–64, 149 N.E. 699.

In *The Continental Insurance Company v. Jachnichen,* (1886) 110 Ind. 59, 10 N.E. 636,

Appellee sued upon a policy of fire insurance, and Continental answered that the appellee had burned the building with intent to defraud it. The trial court gave an instruction advising that Continental, in order to maintain the defense, must establish the truth of such charge beyond a reasonable doubt. This Court reversed, saying in civil actions the rights of the parties are to be determined by a preponderance of the evidence and that since the action was a civil one, it was subject to all the rules belonging to actions of that class, *"without regard to the fact, that the matter in issue may involve the imputation of a crime." Id.* at 64–65, 639, 10 N.E. 636. (Emphasis added). Curiously, however, the court, at the same time, acknowledged that "when an infamous charge is preferred, whether it be in a civil or criminal case, the same presumptions of innocence attach in favor of the party assailed, and doubtless the jury should scrutinize the evidence with *greater caution* before coming to a conclusion in favor of guilt; * * *." *Id.* at 63, 638, 10 N.E. 636. (Emphasis added). It then proceeded to say, "To create a preponderance, the evidence must overcome the opposing presumptions, as well as the opposing evidence." (Citation omitted).

■ "Preponderance of the evidence," when used with respect to determining whether or not one's burden of proof has been met, simply means the "greater weight of the evidence." *Great Atlantic and Pacific Tea Co. v. Custin,* (1938) 214 Ind. 54, 61, 14 N.E.2d 538. To say, then, that in some cases the evidence must overcome opposing presumptions as well as opposing evidence is to acknowledge that more persuasive evidence may be required in some cases than in others.

Although declining to apply it in the case before it, our Court of Appeals, Second District, recently recognized that in some cases, due process required proof in excess of a mere preponderance of the evidence.

"The trial court expressly stated that the preponderance of the evidence standard was used in arriving at the determination of neglect and order of permanent ward-

ship. Appellants contend that the applicable standard is 'clear and convincing' proof, citing *Alsager v. District Court, supra,* 406 F.Supp. 10 [D.C.1975]. We decline to follow Alsager insofar as it suggests that the preponderance of the evidence test does not pass constitutional muster with respect to termination of parental custody."

"The 'clear and convincing' standard has been employed in various quasi-criminal proceedings in recognition of the fact that some civil proceedings are significantly different from the ordinary economic case where 'we view it as no more serious in general for there to be an erroneous verdict in the defendant's favor than for there to be an erroneous verdict in the plaintiff's favor.' *In re Winship* (1970) 397 U.S. 358, 371, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368. The stricter standard is utilized when fundamental rights are involved and the legal and social ramifications of the civil proceeding are serious. So, for example, in cases of involuntary commitment of persons to mental hospitals, our Supreme Court has held that in view of the fundamental liberty interests at stake and the stigma accompanying commitment, due process requires that the fact finder be persuaded by clear and convincing evidence. *Addington v. Texas* (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323. The standard of proof employed reflects society's assessment of where the risk of factual error should fall. Illustrative is the criminal standard of 'beyond a reasonable doubt' which indicates our value determination that it is better to acquit a guilty person than to convict an innocent one. In a proceeding to establish wardship, we must balance the competing interests of the parents, the child, and the state and consider the comparative damage done to each if the fact finder errs." *Tucker v. Marion County Dept. of Public Welfare,* (1980) Ind.App., 408 N.E.2d 814. (Footnotes omitted)

And of particular note are the words "cogent and convincing proof" utilized by Justice Hunter in affirming an award of punitive damages in *Art Hill Ford, Inc. v. Callender,* (1981) Ind., 423 N.E.2d 601, 604.

In determining whether or not we should stray from the traditional "preponderance of the evidence" standard, it should be particularly noted that there is no right to punitive damages *Indianapolis Bleaching Co. v. McMillan,* (1917) 64 Ind. App. 268, 272, 113 N.E. 1019. We have repeatedly said that such damages may be awarded in an appropriate case, as a punishment for the offense and to deter similar misconduct. It has never been implied that a plaintiff has any entitlement to such damages. Rather, he is merely the fortunate recipient of the "windfall." It cannot be said, therefore, that a plaintiff seeking such a bonus is denied any right, if he be held to a degree of proof higher than is required in other actions. In fact, it is incongruous to permit a recovery of that to which there is no entitlement upon evidence that barely warrants a recovery of that which is the plaintiff's absolute right. Yet, that is precisely what may occur when the inference of obduracy, from which punitive damages may flow, is permissible, but not compelled, from the same conduct from which compensatory damages flow, as a matter of right. To avoid such occurrences, punitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing. For, just as we agree that it is better to acquit a person guilty of crime than to convict an innocent one, we cannot deny that, given that the injured party has been fully compensated, it is better to exonerate a wrongdoer from punitive damages, even though his wrong be gross or wicked, than to award them at the expense of one whose error was one that society can tolerate and who has already compensated the victim of his error. The public interest cannot be served by a policy that favors the

latter over the former. And, just as the requirement of proof beyond a reasonable doubt furthers the public interest with respect to criminal cases, a requirement of proof by clear and convincing evidence furthers the public interest when punitive damages are sought.

The propriety of the clear and convincing evidence standard is particularly evident in contract cases, because the breach itself for whatever reason, will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent. Neither should it be assumed that one who stands to reap the harvest of a punitive damage award will, in all cases, himself be reasonable and forthright. Yet, as acknowledged in *Vernon Fire, etc. v. Sharp, supra,* the social cost of a rule which would make claims nondisputable would result in prohibitive social costs. As stated by Justice Hunter, who authored that opinion, "Where the facts surrounding the promisor's breach indicates substandard business conduct, the promisee may also enjoy a limited sense of requital in taking his business elsewhere in the future, *but he is not entitled to mulct the promisor in punitive damages.*" 264 Ind. at 608, 349 N.E.2d 173. (Emphasis added).

A rule that would permit an award of punitive damages upon inferences permissibly drawn from evidence of no greater persuasive value than that required to uphold a finding of the breach of contract—which may be nothing more than a refusal to pay the amount demanded and subsequently found to be owing—injects such risks into refusing and defending against questionable claims as to render them, in essence, nondisputable. The public interest cannot be served by any policy that deters resort to the courts for the determination of bona fide commercial disputes. "The infliction of this damage has generally been regarded as privileged, and not compensable, for the simple reason that it is worth more to society than it costs, i.e., the insurer is permitted to dispute its liability in good faith because of the prohibitive social costs of a rule which would make claims nondisputable." *Vernon Fire, etc. v. Sharp, supra,* 264 Ind. 609, 610, 349 N.E.2d 173.

Plaintiff and a Mr. Bognar, an employee of the defendant, met promptly after the fire loss was reported and, together with a repair contractor, surveyed the damage. The contractor estimated the cost of restoring the house at $8,729.62. Approximately one week later, on November 13th, Mr. Bognar contacted Plaintiff, by telephone and advised her that, based upon the repair estimate, Defendant would pay $6,497.22 if the house was to be repaired and that otherwise it would pay $4,200.00. When asked for an explanation of the offer, Mr. Bognar acknowledged that he did not fully understand it himself but that there were percentage requirements provided in the policy which governed the matter and that the property had been under-insured.

The plaintiff, not being satisfied with Mr. Bognar's explanation and believing that Defendant was trying to cheat her, told Mr. Bognar as much and subsequently related the problem to her son, who recommended that she turn the matter over to a lawyer, which she did. The lawyer contacted Mr. Bognar by telephone on November 21st and by letter on November 22nd and advised of his representation.

The complaint, seeking compensatory damages in the full amount of the repair estimate plus punitive damages in the sum of $25,000.00 was filed April 19, 1974. To support the claim for punitive damages, it was alleged that the defendant's conduct in offering less than the full repair estimate and in representing that a co-insurance provision of the policy controlled the amount of the offer, sought "to hold this umbrella of deceit, fraud, and oppressive conduct to shield itself from Plaintiff's legitimate claim."

Plaintiff's allegations of fraud, deceit and oppressive conduct simply have not been borne out by clear and convincing evidence. Conceivably, although doubtfully, under a less stringent standard, a fraudulent intent might be inferable from Mr. Bognar's representation that the basis for offering to pay less than the cost of repairs

was a "percentage requirement" in the policy. It was the Court of Appeals opinion that a fraudulent intent could be inferred because "Although Travelers claims the misrepresentation was a mistake, there is no evidence which shows that the mistake was admitted or corrected." 384 N.E.2d at p. 618. There are several reasons why the judgment cannot rest upon such a conclusion. First, the burden was not upon the defendant to prove that it was a mistake. Rather, it was incumbent upon the plaintiff to present evidence from which it could be clearly and convincingly inferred that the defendant knew such representation to be false. The mere fact that a representation is false does not raise a presumption that the person charged with making it had knowledge of its falsity. Moreover, an intent to defraud is not presumed from the mere fact that a motive may have existed—or did exist. 37 Am.Jur.2d, *Fraud and Deceit* § 446.

Secondly, Plaintiff did not ever rely upon Mr. Bognar's representation, but immediately sought the advice of legal counsel. In this respect, it appears that she used good judgment—considering his candid admission that he did not fully understand the matter himself.

Thirdly, although there are certain legal and domestic relationships in which the law raises a presumption of trust and confidence on one side and a corresponding influence on the other, such as the relationship of attorney and client, guardian and ward, parent and child, as well as others, *Keys v. McDowell,* (1913) 54 Ind.App. 263, 269, 100 N.E. 385, we are aware of no instance where it has been held or even urged that the relationship between an insuror and the insured entitles the insured, after a dispute has arisen, to rely upon the insuror's interpretation of the contract. This is not to say that the insuror is under no duty to refrain from making fraudulent representations and to act in good faith but only that it is not bound to be correct. Were it otherwise, there simply could be no direct adjustment of claims.

Finally, the Court of Appeals was in error in writing that there was no evidence to show that the mistake was admitted or corrected. Mr. Bognar testified that the offer was the product of his error in erroneously assuming that the liability was to be determined under the "cost of repair or replacement (without deduction for depreciation)" provision of the policy; whereas it was, in fact, governed by the "actual cash value" provisions. This error accounts for the dual or alternative offer of one amount if the building was restored and a lesser one if it was not, which was also inappropriate. Under the "actual cash value" provisions, the insured is entitled to be reimbursed for the actual cash value of the loss, without regard to whether or not the damaged premises are repaired or restored. Under the "cost of repair or replacement" provisions, the insured is entitled to recover such cost if, and only if, they are in fact, repaired or restored. An additional condition of liability under this provision is that the building be insured for 80% or more of its full replacement cost. If it is not, the insuror's maximum liability is reduced in proportion to the deficit. This would account for the initial and erroneous offer of $6,497.22 if the building was repaired, although the repair estimate was $8,729.62, and Mr. Bognar's attempted explanation, as related by Plaintiff: "The percentage or something or other. There was something he said in the policy that was percentage wise and the insurance wasn't high enough, that they hadn't insured the property high enough to take care of this."

That Mr. Bognar gave misinformation to Plaintiff is consistent with the hypothesis of a fraudulent intent. However, as previously noted, standing alone it is not sufficient because it is not inconsistent with the hypothesis of honest, human error. And it does stand alone. No other evidence augments a hypothesis that Mr. Bognar knew that what he said was wrong.

The Court of Appeals was also incorrect in writing that the error was never corrected. On June 1st, Mr. Bognar's superior, wrote to Plaintiff's attorney and enclosed a check for $6,497.22 as an offer of full settle-

ment without regard to whether or not the building was repaired. The letter correctly explained why the offer was for less than the estimated cost of repairs and expressed the belief that the depreciation factor of 25% was "very just and fair" under an "actual cash value" policy and considering the age of the building.

Although this offer was for less than the jury ultimately found to be owing, it was well within the range allowable under the broad evidence rule. The Court of Appeals upheld the award of punitive damages because it erroneously concluded that Plaintiff was clearly entitled to recover the full cost of repairs, without depreciation. We, on the other hand, have upheld the jury's award of compensatory damages, not because Plaintiff was entitled to recover the full cost of repairs but rather because the jury was entitled, not bound, to award that amount under the evidence. The award of punitive damages is, therefore, ordered vacated, as unsupported by clear and convincing evidence.

## COMPETENCY OF EXPERT WITNESS

Mr. McGinley testified that he was president of a local bank and familiar with local real estate values and had been familiar with the house in question for fifteen years, although he had not been inside it since substantial remodeling had occurred to the interior. He was permitted to express an opinion as to the value of the house immediately prior to the fire and immediately thereafter, over Defendant's objection that he was incompetent by reason of his admission that he had not seen the interior of the house immediately prior to the fire.

 The competency of a witness to testify as an expert is a matter to be determined by the trial court judge and subject to his broad discretion. *Lineback v. State,* (1973) 260 Ind. 503, 301 N.E.2d 636; *Tyler v. State,* (1968) 250 Ind. 419, 236 N.E.2d 815. His competency is to be determined by his knowledge of the subject matter generally, whereas his knowledge of the specific subject of the inquiry goes to the weight to be accorded to his opinion. We see no error in

the Court's having permitted the witness to testify, although the credibility of his opinion might be subject to considerable scrutiny.

## PREJUDGMENT INTEREST

 The parties entered into the following stipulation:

"The parties stipulate and agree that in the event jury returns a verdict for compensatory damages the court shall compute interest thereon at 8% per annum."

The court rendered judgment upon the verdict for compensatory damages in the sum of $8,729.62, together with 8% interest per annum from the date of the loss, in the sum of $1,785.13, and Defendant here contends that the stipulation only empowered the judge to compute the interest lawfully payable and that interest could not accrue until the debt was due. He points to the following quoted provision of the contract:

"The amount of loss for which this company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this company and ascertainment of the loss is made either by agreement between the insured and this company expressed in writing or by filing with this company of an award as herein provided."

Defendant contends that since the amount of the loss was never determined prior to rendition of the judgment, interest could not accrue until then. Had the amount of loss been determined in accordance with the contract provisions, i.e., by agreement of the parties or, alternatively, by award of appraisers selected in accordance with the contract terms, payment would not have been due until sixty days after such determination. However, neither party elected to enforce this policy provision.

 It is not always a prerequisite to the allowance of prejudgment interest that the amount of the damages be liquidated. " * * * The true test to be applied as to whether interest should be allowed before judgment in a given case or not is, there-

fore, not whether the damages are unliquidated or otherwise, but whether the injury and consequent damages are complete and must be ascertained as of a particular time and in accordance with fixed rules of evidence and known standards of value, which the court or jury must follow in fixing the amount, rather than be guided by their best judgment in assessing the amount to be allowed for past as well as for future injury, or for elements that cannot be measured by any fixed standards of value." *New York, etc. R. Co. v. Roper,* (1911) 176 Ind. 497, 507, 96 N.E. 468 (quoting from *Fell v. Union Pac. R. Co.,* (1907) 32 Utah 101, 88 P. 1003, 28 L.R.A.(N.S.) 1.

We find it difficult to comprehend why counsel would have agreed to the stipulation if the court could not carry out its terms. If pretrial interest could not attach, there was no need for the stipulation.

The cause is remanded to the trial court with instructions to vacate that portion of the judgment providing for punitive damages. In all other respects, the judgment is affirmed.

DeBRULER and HUNTER, JJ., concur.

GIVAN, C.J., dissents with opinion.

PIVARNIK, J., not participating.

GIVAN, Chief Justice, dissenting.

I respectfully dissent from the majority opinion's decision concerning punitive damages. I agree with the guidelines laid down in the majority opinion, but I disagree with their application in the case at bar. The facts submitted in the trial court are sufficient to support the award of punitive damages.

There is no question but what Travelers through its agent misrepresented the insurance contract to the plaintiff. They now argue that such a misrepresentation was a mere "mistake." It was well within the province of the jury to believe that Travelers was an expert in its business, that it fully understood the import of the contract in question and that the misrepresentation to the plaintiff was deliberately calculated to take advantage of her in a situation in which she had no expertise.

It was fully within the province of the jury also to consider the stress this misrepresentation placed the plaintiff in and it certainly could consider that she was required to employ counsel who was, in turn, forced to engage in costly litigation in her behalf when a simple and correct application of the contract by Travelers would have resulted in prompt payment without such litigation.

Although I agree with the general principles of law laid down in the majority opinion, I feel the majority has transcended the bounds of appellate review and has engaged in a weighing of the evidence to determine that punitive damages should not have been awarded.

I would affirm the trial court in all respects.