**J. YANAN & ASSOCIATES, INC.,**
**Plaintiff-Appellee,**

v.

**INTEGRITY INSURANCE COMPANY,**
**Defendant-Appellant.**

**No. 84–2442.**

United States Court of Appeals,
Seventh Circuit.

Argued April 18, 1985.

Decided Aug. 26, 1985.

As Amended Sept. 27, 1985.

Joseph P. Murdock, Smith & Murdock, Indianapolis, Ind., for plaintiff-appellee.

Lewis A. Kaplan, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant-appellant.

Before CUDAHY and POSNER, Circuit Judges, and PELL, Senior Circuit Judge.

CUDAHY, Circuit Judge.

The plaintiff, Yanan & Associates, brought this action in the Southern District of Indiana charging the defendant, Integrity Insurance, with breach of an oral agreement and with additional tortious misconduct, and seeking compensatory and punitive damages. Integrity appeals from a jury award of $48,000 in compensatory damages and a modified award of $150,000 in punitive damages. We affirm in part and reverse in part.

I

James Yanan is the owner of J. Yanan & Associates, an independent insurance agency headquartered in Indiana. Integrity Insurance Company is a property and casualty insurer headquartered in New Jersey. In April of 1978 Yanan and Integrity entered into a written agreement under which Yanan & Associates became a managing general agent for Integrity.

Before the agreement was signed, Yanan had provided Integrity with financial statements for the fiscal year ending January 31, 1977, nearly fifteen months before. The balance sheet showed that, as of that date, Yanan & Associates had a net worth of roughly $47,000. Integrity evidently did not insist upon more recent statements before signing. Three months later, in July of 1978, Yanan provided Integrity with financial statements for the year ending January 31, 1978. The balance sheet for that year showed that Yanan & Associates' liabilities exceeded its assets by $175,347. Integrity, concerned about the sudden change in Yanan's financial condition, asked for an explanation. A letter from the secretary-treasurer of Yanan & Associates to the Vice President of Integrity, dated July 28, 1979, explained that in the interim James Yanan had repurchased stock held by other shareholders, and was now the sole shareholder.[1] Apparently Yanan had written off

---

1. July 28, 1978

Mr. Larry Stearn
Executive Vice President
Integrity Insurance Company
365 West Passaic Street
Rochelle Park, New Jersey 07662

Dear Larry:

In answer to your request of July 20, 1978, I present the following information relating to J. Yanan & Associates Working Capital Ratio.

As Mr. Yanan intimated to you, J. Yanan & Associates stock was held by two (2) individuals and Jim Yanan. Two other corporations were also owned by the three individuals[,] [t]he Corporations being related only through the mutual ownership by the three individuals[,] J. Yanan & Associates being the most profitable and in fact financially supporting the others.

J. Yanan & Associates developed large loan balances attempting to support the other less profitable Corporation[s]. Major differences in management decision making and the continued inability of the other Corporations to generate profit resulted in a decision to dissolve the relationship.

All J. Yanan & Associates stock was returned to Jim Yanan. To repurchase this stock (which Jim had *given* to these individuals) Yanan & Associates, Inc. was forced in effect to write off the loan which developed from supporting other Corporations. So, one Corporation was allowed to keep its loan from J. Yanan (in return for its owners Yanan stock) and the other individual was given cash settlement.

At the time the decision was made, it was agreed that the actual dissolution would take place at the most opportune time for all three (3) parties. The decision was made to make transfer after the close of operations January 31, 1978. (Fiscal year end for all three (3) entities.)

In addition to the above stock repurchase, previous years profit distributions were waived in favor of growth potential. All profit distributions were invested in additional sales staff and expanding territories. Therefore, all distributions of prior years profits were demanded at the time of dissolution.

So in conclusion, J. Yanan & Associates Financial Statements for January 31, 1978, reflects the past problems of the dissolution of the relationship of the three (3) partners.

We feel that the earning power of J. Yanan & Associates will overcome the repurchase of Yanan stock, and the past investment in the other Corporations. We strongly feel the dissolution of these relationships enhances Yanan's concentration in Insurance Marketing.

Sincerely,

J. YANAN & ASSOCIATES, INC.

/s/ Joe Becher

Joseph Becher
Secretary/Treasurer

loans from Yanan & Associates to the other two shareholders and had distributed the corporation's reserves as part of the transaction.

Testimony from witnesses for each side indicates that Integrity was concerned that Yanan was, in effect, "bankrupt;" there evidently was some discussion about cancelling Yanan's contract. On August 14, 1978, Yanan and an associate went to Integrity's home office to try to reach an agreement satisfactory to both parties. Yanan agreed to furnish Integrity with a letter of credit for $150,000, and on the same day signed[2] an agreement under which premiums collected by Yanan for Integrity would be deposited to a "lock box" account in an Indiana bank, from which only Integrity could make withdrawals, and only sixty days after the end of the month in which the premiums became due. The interest that accrued would go to Yanan. The earlier arrangement had simply required Yanan to maintain the premiums "in a manner satisfactory to [Integrity]."

There is some dispute about the significance of the letter of credit. When Yanan and his associate went to Integrity's office on August 14, Yanan first met alone with Lawrence Stern, Integrity's president. According to Yanan, he wanted some assurance that, if he continued to convert business to Integrity, he would not be arbitrarily cancelled at some point. Accordingly, he agreed to provide the letter of credit in answer to Integrity's concern about the

financial condition of Yanan & Associates, and he received in return an oral agreement from Stern not to cancel Yanan's contract for 18 months, in answer to Yanan's concern about being cancelled. The original agreement, dated April 1, 1978, provided that either party could terminate on 60 days notice.

Stern, on the other hand, denied that he had agreed orally not to cancel Yanan's contract for 18 months. According to him, the letter of credit was required as security for the premiums Yanan was writing, because of Yanan's poor financial condition. When Stern and Yanan rejoined the others, there was apparently no reference to the oral agreement that Yanan claims was made.

On March 5, 1979, Integrity notified Yanan & Associates that it was terminating the agency contract on May 5, 1979, roughly nine months after the August 14, 1978 meeting, and roughly thirteen months after the agency agreement was originally entered into. In the notice of termination Integrity referred to the sixty days termination provision of the agency contract.

In response to the termination Yanan at first expressed surprise[3] but did not mention any oral 18 month termination agreement. Later, in a letter dated April 27, 1979, Yanan thanked Stern for extending the agreement to June 5, 1979. In that same letter, Yanan asked Stern to cash the letter of credit against current accounts due.[4] Integrity at first refused, taking the

---

**2.** The agreement was a standard form sent by Integrity for Yanan to sign. Yanan's copy (Plaintiff's Exhibit 11) has the words "rec'd 8/14/78" handwritten, along with Joseph Becher's signature across the bottom of the page.

**3.** A letter of March 13, 1979, from Yanan to Lawrence Stern said in part:

Dear Larry:
    Needless to say, I'm surprised at your letter of termination of our General Agency Agreement.... There's no doubt in my mind that we can work our way out of this situation given a 6–8 months period of time.

**4.** April 27, 1979
Mr. Lawrence E. Stern

Executive Vice President
Integrity Insurance Company    .
Mack Center Drive
Paramus, New Jersey
Dear Larry:
    I would like to thank you for the extension of our contract in selected states, and, as per our agreement, all business will be terminated by June 5, 1979.
    Due to the cancellation of your contract, we by necessity, are picking up a new carrier. We find our other carrier in mind would like some financial guarantees, much like you did, re our letter of credit.
    Therefore, I ask you to cash our letter of credit for the full amount of $150,000. This obviously overpays our account current due April 30th as you have approximately $14,000 in

position that the letter was to serve as security for premiums that Yanan would continue to collect for over a year after termination of the contract. Yanan objected that that had not been part of the contract, and would jeopardize Yanan's ability to find another insurer to do business with; he notified Integrity that he would stop making payments into the "lock box" account until Integrity accepted tender of the letter of credit as payment on account due. On May 24, 1979, Integrity wrote to Yanan saying that it had cashed the letter of credit, and demanding that Yanan resume payments to the lock box account.

On June 14, 1979, Integrity brought suit in the Indiana courts to enforce the lock box agreement. On June 20, 1979, the probate court entered an "agreed judgment" under which Yanan agreed to make future payments into the "lock box" account; it had become apparent that Yanan had actually resumed payment on June 5. Whether Integrity knew of the June 5 and subsequent payments at the time of filing suit is disputed.

Yanan subsequently brought suit in the Indiana courts for breach of the alleged oral contract not to terminate for 18 months, and for punitive damages for that breach. Integrity removed the action to the United States District Court for the Southern District of Indiana. The jury returned verdicts for Yanan, awarding $48,000 for breach of the contract and $250,000 in punitive damages. In response to Integrity's post-trial motions the court reduced punitive damages to $150,000. Integrity complains on appeal of evidence improperly admitted, and of insufficient evidence to support the award of punitive damages.

## II.

### A. Admissibility of evidence.

In support of his claim to have reached an oral agreement with Integrity's president, Yanan testified concerning an agreement that he had entered into with the Allied Fidelity Insurance Company; under that agreement he gave a letter of credit as consideration for a one-year no-cancellation period. This deal was struck some time after Yanan began this action. When Integrity objected to the admission of evidence of that agreement, Yanan's counsel explained the point of the offer:

> [I]t is introduced as a relevant exhibit ... to show the intent, ... the manner in which the business has been conducted and the fact it is a common situation to enter into extended periods of cancellation agreement in consideration for a letter of credit.

The trial judge admitted the evidence.

Integrity argues that the evidence would not have justified a jury in concluding, from this single transaction, that there was such a practice.[5] According to Integrity, evidence of custom is not probative unless it is clear that the custom or practice would govern most similar transactions. We believe that that argument misconceives how the evidence was to be used. Although evidence of consistent practice would be necessary to establish that such and such is the custom, a single example (the so-called "counterexample") has probative value when the point is to show that something is *not* the practice. In this case, Integrity's strategy was to argue that it would *never*

---

the lock box and our April 30th billing is only $116,938.71. The remaining part of the $150,000, or approximately $47,000, I want you to apply to our May 31st account current.

This will make for a cleaner break and our insurer will reduce your concern about our account. This will also free up by available assets as they are needed elsewhere.

Sincerely,

James P. Yanan.

**5.** Integrity also argues, somewhat incongruously, that there is no evidence that Integrity knew of the practice, if there was one. Integrity evidently has in mind a rule which says that obligations created by custom and practice do not bind a party that is not aware of them. Such a rule is obviously irrelevant here, where the evidence was introduced not to show that custom and practice imposed an obligation on Integrity, but to show either that custom and practice did not rule out a nontermination agreement, or to show that it was unlikely that a letter of credit would have been issued without additional consideration.

have given an 18 month no-cancellation guarantee; that it would have been irresponsible to do so; and that no insurer in the business would have done it. In closing argument, for example, Integrity's counsel made this argument:

> [Integrity has] no long-term agreements with any managing general agent, including the one that they own.... [T]hey have managing general agents who have been with them for ten years or more[,] producing millions of dollars' worth of business, and do not have any noncancellable contracts or any contracts for a fixed term. And that was explained to you on the basis of the fact that it would be irresponsible for an insurance company to guarantee to write this man's business for a period beyond the normal 60-day cancellation because they don't know what kind of business he is going to write. And he picked some terrible business, as is demonstrated here. And that is the very reason that you would not give an 18-month absolute contract to anybody.

Appellant's Appendix at 715. Faced with that sort of argument about the nature of the practice of insurers and agents, it is appropriate and probative to show instances in which such "absolute" agreements have in fact been made.

Of course, the example chosen by the plaintiff is more or less self-serving. Ideally evidence of this sort would consist of examples involving circumstances which would rule out the possibility of having been contrived specifically for use as evidence. Here the single example adduced was an agreement entered into by the plaintiff *after* this action had been filed. Those circumstances certainly lessen the probative value of the evidence, and a jury might have been justified in reaching the conclusion that the agreement was entered into solely to provide evidence in this case. That does not mean, however, that the district judge was wrong to allow the issue to go to the jury.

It is not self-evident, for example, that another insurer, Allied Fidelity, would col-

lude with Yanan for purposes of this action; and if Allied entered into the agreement in good faith, then the agreement arguably has some probative force even if, on Yanan's side, it was arranged with this litigation in mind. The judge was clear about the defects in the evidence when he addressed the jury about its value:

> The Court is going to let it go into the record, but with the instruction to the jury that it shall be considered only to the extent that it may enlighten the jury and the Court with regard to the practice in the industry with reference to this type of contract [or] contractual relationship. And the jury will, of course, take into account the fact that it was a written extension of time compared to what we have here, [an] oral agreement; that it was entered into subsequent to the controversy in this action that we are hearing about. [In remarks quoted on the previous page of the trial transcript, the judge had made clear that the agreement was reached after this action had begun.] All of these are matters that weigh on credibility that the jury should attribute to the transaction between J. Yanan & Associates and some other insurance company.

Appellant's Appendix at 108.

We do not think, therefore, in spite of the limited value of the evidence, that it was error to have admitted it. It was not evidence that Yanan and Integrity had in fact entered into the 18 month agreement; but it was evidence that such an agreement was not impossible. Given that Integrity's version of the facts entails that Yanan was given nothing in return for the letter of credit, that Yanan left that meeting with nothing more than he had when he walked in, that is, a guarantee of sixty days notice before termination, it would not be unreasonable for a jury to find the Yanan-Allied Fidelity scenario the more plausible one (provided that it was not, as Integrity claimed, impossible) and to reach the conclusion that in fact Yanan was telling the truth about having struck such a bargain with Integrity. The relative positions of

this court and the trial jury prevent us from substituting our own notions of what is likely to have happened for those of the jury. There was certainly evidence to support a contrary finding: in correspondence after the termination Yanan had nothing to say about any 18 month agreement, and even thanked Integrity for allowing him ninety days rather than just the contractual sixty days for winding up. That is rather persuasive evidence that there was no agreement. Nevertheless it is not conclusive,[6] and it would not justify our overturning a jury verdict.

The trial court also admitted into evidence a consent decree that Integrity had entered into earlier, introduced by Yanan for the purpose of impeaching a witness. Integrity argues that reception of that evidence was error.

One of the original counts in this action was for defamation.[7] Integrity had published a prospectus in 1981 in which it claimed that it had been forced to bring suit against Yanan to collect unpaid premiums. Yanan's counsel tried to establish at trial in this action that at the time the prospectus was published, Integrity's officers—those responsible for the prospectus—knew that the claim was false, and knew that Yanan was paid up at the time Integrity brought the Indiana suit. That was the basis of the defamation count. When a witness for Integrity testified that Integrity would not knowingly allow false information to be published in such a prospectus, Yanan's counsel asked the court to admit a consent decree which Integrity had entered into in California (as the outcome of other litigation), and the court did admit

it. The decree shows that a certificate that Integrity had filed with the state had contained false information.[8]

■ Integrity objected to the admission of the decree, and argues now that it is inadmissible under the rules of evidence. We are inclined to agree. As impeachment evidence, the consent decree is something the witness may be questioned about on cross-examination; if he denies its existence, however, or refuses to admit its contents, the fact of the matter may not be proved by extrinsic evidence. Fed.R.Ev. 608(b). As a prior inconsistent statement, it must contradict something the witness says now; and even if the consent decree is a prior admission that something false was said on a prior occasion, that is not inconsistent with the statement that the truth was told on a later occasion. Fed.R.Ev. 613(b).

The admission of the decree placed before the jury apparent evidence of wrongdoing and since its admission was erroneous there can be no claim that the prejudice was outweighed by the probative value. Evidence of wrongdoing—like all "character" evidence—is admitted with caution, and only under well-known constraints, for the reason that it is likely to be understood as evidence of a general proclivity to do wrong, and that it makes it easier for the jury to punish a defendant about whose liability for the injury at issue in the present trial they may have some doubt. It is unlikely that the taint introduced by such evidence would stop at the borders of the particular count to which it is supposed to be relevant.

Nevertheless, the error seems to us to have been harmless in this instance. The

---

**6.** It is not inconceivable that a party might choose not to press a right guaranteed by an oral agreement until some behavior of the other party, perceived as unfair, led to litigation.

**7.** The jury returned a verdict on this claim awarding plaintiffs $261,000 in compensatory damages and $739,000 in punitive damages. The trial court reduced the latter award to $50,000.

**8.** The final page of the decree says this:
"Integrity Insurance Co. ... consents to the entry of findings being used by the Insurance Commissioner as the basis for the imposition of a monetary penalty in lieu of any other penalty...."
Appellant's Appendix at 574.

prior wrongdoing was never conceded by the defendant, and counsel for Integrity on redirect examination was able, each time the issue was raised, to argue fully Integrity's rather innocent interpretation of the document. Appellant's Appendix at 584–86, 656–58. Integrity succeeded in making the point that the California decree resulted in Integrity's enlarging its powers in that state, and that consenting to the provisions of the decree enabled it to reach that result without time-consuming litigation.

In fact, the decree itself, which was read to the jury, lists infractions that resemble oversights more than crimes; and the conclusions it draws from the facts do not contain very strong language:

> Whereas, it appears to said Commissioner that the foregoing facts may establish good and sufficient cause to deny the application of respondent for an amended Certificate of Authority pursuant to the provision Section 717 of the Insurance Code in that these facts may indicate inadequate management control over the preparation of annual statements and that absence of appreciation of the necessity of the respondent to comply with the requirement of this state and requests from the staff of said Commissioner; and

> Whereas, it also appears to said Commissioner respondent's management understands the seriousness of these matters and have taken corrective action to foreclosure the reoccurrence of these problems.

> Now, therefore, good cause appearing ... the Commissioner ... orders the issuance of the amended certificate of authority.

Appellant's Appendix at 573. The language suggests poor management more than it does malice, and does not seem to us to go very far toward bringing the integrity of the corporation into question.

We have expressed on other occasions our concern that character evidence not be abused—see, e.g., United States v. Chaimson, 760 F.2d 798, 813 (7th Cir.1985) (Cudahy, J., concurring)—but it seems to us that in this case, where the improperly admitted evidence is not clearly incriminating (and where it takes up perhaps ten out of seven hundred fifty pages of transcript), its admission should be treated as harmless.

Integrity also complains of the admission of the evidence of a former Integrity agent. Yanan undertook to prove that Integrity terminated Yanan for the purpose of diverting business that had gone through Yanan to the Forward Agency, Integrity's affiliate. Yanan called on Ross White, a former managing general agent for Integrity. White testified that he had been terminated by Integrity in 1980; the reason he gave was that "[t]hey terminated us to go direct to the Forward Agency." Appellant's Appendix at 438. Integrity objected that the termination of another agent a year after Yanan's termination was irrelevant, and Yanan's counsel responded that the evidence was admissible as proof of intent.

■ Under Federal Rule of Evidence 404, evidence of other acts is admissible as evidence of intent or of a plan, but not as evidence of character. In this case, it was evidently Yanan's strategy to show a general plan to close out unaffiliated agents for the purpose of channeling business through Integrity's own affiliate. Although there was no contention that the termination of the other agents was wrongful, that was not necessary for the purpose of establishing a general plan which might have served as the motive for the allegedly wrongful termination of Yanan. We see

nothing improper about the admission of that evidence.[9]

## B. Punitive Damages.

On the theory that Integrity had not only breached the oral contract, but had breached it for the improper motive of taking business directly through its affiliate, and that Integrity had harassed Yanan in an attempt to get Yanan to give up the right to bring this suit, Yanan sought punitive damages. The alleged harassment took the form of refusing to cash the letter of credit, and continuing with the Indiana lawsuit after learning that Yanan's payments were up to date.

■ Indiana is practically alone among the states in allowing punitive damages for breach of contract. Such damages are allowed where, in addition to the breach, there are both "a serious wrong, tortious in nature and a strong public interest" to be served. *Royal Business Machines, Inc. v. Lorraine Corp.*, 633 F.2d 34, 48 (7th Cir. 1980); *see Canada Dry Corp. v. Nehi Beverage Co., Inc.*, 723 F.2d 512, 524–26 (7th Cir.1983). There are evidently two separate sets of conditions under which punitive damages for breach of contract are allowed in Indiana: (1) where the conduct that establishes the breach of conduct independently establishes a common law tort; in that case the punitive damages are awarded for the tort, *Art Hill Ford, Inc. v. Callender*, 423 N.E.2d 601, 602 (Ind.1981); *F.D. Borkholder Co. v. Sandock*, 274 Ind. 612, 413 N.E.2d 567, 571 (1980); and (2) where (a) "elements of fraud, malice, gross negligence or oppression mingle in the controversy," and (b) "it can be shown that the public interest will be served by the deterrent effect of the punitive damages," *Art Hill Ford, supra*, at 602; *Hibschman Pontiac v. Batchelor*, 266 Ind. 310, 362 N.E.2d 845, 847–48 (1977).

In *Vernon Fire, supra*, the tortious conduct supporting punitive damages was economic duress; the insurance company had refused to pay on a claim (the breach) until the insured procured a release on an unrelated claim, a service to which the insurer was not entitled (the tortious conduct). In *Jones v. Abriani*, 169 Ind.App. 556, 350 N.E.2d 635 (1976), the tortious conduct was again economic duress: the defendant told the plaintiff, purchaser of a mobile house, that if he did not accept the home, defective as it was, he would forfeit his substantial down payment (tortious conduct); the defects were never repaired (breach).

Something similar has been alleged in this case: Yanan alleges that Integrity breached the oral contract in order to take business directly; and that Integrity pressured Yanan, by refusing to cash the letter of credit, by bringing the Indiana lawsuit and by other conduct as well, to give up its right to bring the present suit.

In *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349 (Ind.1982), the Indiana Supreme Court held that conduct supporting a claim of punitive damages for breach of contract must be proved by clear and convincing evidence. "[P]unitive damages should not be allowable upon evidence that is merely consistent with the hypothesis of malice, fraud, gross negligence or oppressiveness. Rather, some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, overzealousness, mere negligence or other such noniniquitous human failing." *Id.* at 362. "The propriety of the clear and convincing evidence standard is particularly evident in contract cases, because the breach itself ... will almost invariably be regarded by the complaining party as oppressive, if not outright fraudulent. Neither should it be assumed that one who stands to reap the harvest of a punitive damage award will, in all cases, himself be reasonable and forthright....

**9.** White testified that he was told by an agent of Integrity that that firm wanted to channel evidence through its affiliate, the Forward Agency.

Integrity now suggests a hearsay problem, but no such objection was raised at trial. In any case, see Fed.R.Ev. 801(d)(2).

A rule that would permit an award of punitive damages upon inferences permissibly drawn from evidence of no greater persuasive value than that required to uphold a finding of the breach of contract—which may be nothing more than a refusal to pay the amount demanded and subsequently found to be owing—injects such risks into refusing and defending against questionable claims as to render them, in essence, nondisputable." *Id.* at 363. The *Armstrong* clear and convincing evidence standard applies retrospectively. *Don Medow Motors, Inc. v. Grauman*, 446 N.E.2d 651 (Ind.App.1983).

■ On appeal from a jury verdict, we are entitled to reverse only if all the evidence points in one direction, and there was a different outcome below. *Basham v. Pennsylvania R.R. Co.*, 372 U.S. 699, 701, 83 S.Ct. 965, 967, 10 L.Ed.2d 80 (1963). That standard is in apparent conflict with the *Armstrong* clear and convincing evidence rule for punitive damages. The *Armstrong* rule says that punitive damages are inappropriate unless there is evidence that is *inconsistent* with innocence; if the evidence is merely consistent with wrongdoing, if, given the evidence, there might have been wrongdoing and there might not, then punitive damages are inappropriate under the *Armstrong* rule. Thus if the evidence is merely consistent with the wrong-doing, and thus points in more than one direction, a jury award of punitive damages would be improper; and yet, on the accepted standards of review, reversal would apparently be inappropriate, since all the evidence does not point in one direction.

There are in fact three possibilities: the evidence may all point in one direction; there may be conflicting evidence, pointing in several directions, with evidence on one side inconsistent with innocence; and there may merely be evidence which is consistent with both innocence and wrongdoing. In the first case, a jury verdict must follow the evidence or be reversed. In the second case, an award of punitive damages would be justified; but a jury verdict either way would probably be upheld. It is the third

case that raises the problem. The evidence in that case may also be said to point in several directions, which means that a jury verdict either way ought to be upheld; and yet an award of punitive damages would clearly be wrong under Indiana law.

We think that the proper way to treat the third possibility is this: as far as punitive damages are concerned, evidence merely consistent with wrongdoing (and consistent with innocence as well) points in one direction only—punitive damages are improper. We think that such a construction preserves the difference between compensatory and punitive damages that Indiana means to preserve; for although evidence merely consistent with wrongdoing will not support punitive damages, evidence merely consistent with the breach of contract may support compensatory damages. *Armstrong*, 442 N.E.2d at 363.

The evidence in this case was at best *consistent* with wrongdoing. In the first place, breach of a contract to take business directly is not tortious: in many cases where a contract is breached, the motive is to take advantage of some alternative, more profitable courses of action. In such cases, compensatory damages suffice: the point is to make a breach so expensive that it will not be undertaken unless, all things considered, the benefits of the switch outweigh the costs, but not so expensive that even a beneficial switch will not be undertaken. Even if it was established at trial by clear and convincing evidence that the purpose for Yanan's termination was to redirect the business to an Integrity affiliate, there is nothing tortious—that is, public policy does not call for an independently deterrent award beyond compensatory damages—about that motive.

All of the evidence supporting Yanan's claim that Integrity used harrassment and intimidation to get Yanan to give up his right to sue, on the other hand, is clearly consistent with a hypothesis of the innocence of Integrity's conduct. Integrity did refuse to cash the letter of credit after terminating Yanan; but its right to do so was at least colorable, since the purpose of

the letter was to guarantee payment of premiums, should Yanan's financial situation degenerate; and premiums would continue to be due from Yanan for some time.[10] Integrity also maintained the Indiana suit for nonpayment of premiums from June 14, 1979 until a hearing on June 20, 1979. At the hearing Integrity acknowledged that Yanan had resumed payments into the "lockbox" on June 5, and was currently up to date. Integrity then dropped the suit. Yanan introduced evidence to show that Integrity was apprised of deposits to the lockbox by the bank; but we cannot see that the evidence—assuming it to have been clear and convincing—shows any more than a lack of communication within Integrity. Yanan had stopped making lockbox payments in April 1979; Integrity demanded that Yanan resume payments on May 24. On June 14, 1979 Integrity brought suit in Indiana Probate Court to enforce the lockbox agreement. Meanwhile, on June 5 Yanan had resumed payments. The timing of these events does not suggest malice; Integrity dropped the suit a week after it was begun.

Integrity also made a settlement proposal to Yanan on June 7, 1979, in which it asked Yanan to waive claims Yanan might have concerning the termination in return for Integrity's agreement to give up any claims it might have. Such bargaining for a waiver of claims is not uncommon, and is perhaps a desirable way to settle disputes such as this. We understand that, all in all, the proposal may have been unfavorable to Yanan; but Yanan was free to reject the proposal, and did reject it.

Altogether, then, it seems to us that the evidence supporting the award of punitive damages supported propositions (that Integrity held on to the letter of credit, that Integrity brought suit after Yanan had resumed payments, etc.) that are at most consistent with wrongdoing on the part of Integrity; but also at least consistent with an innocent interpretation. Under

those circumstances, the issue of punitive damages ought not to have gone to the jury, and we therefore reverse that award.

The award of compensatory damages is affirmed, and the award of punitive damages reversed.

---

10. The letter of credit did not mention the possibility of termination. The letter was to remain in effect for a year.