James PATTON, R.L. Hildebrand, Burns Harbor Plaza, Inc., and R.L. Hildebrand Enterprises, Inc., Plaintiffs–Appellees,

v.

MID–CONTINENT SYSTEMS, INC., Defendant–Appellant.

No. 87–1579.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 8, 1988.

Decided March 8, 1988.

Rehearing and Rehearing En Banc Denied April 18, 1988.

Gilbert F. Blackmun, Friedrich, Bomberger, Tweedle & Blackmun, P.C., Highland, Ind., for defendant-appellant.

Richard E. Anderson, Theodoros, Anderson & Tauber, P.C., Merrillville, Ind., for plaintiffs-appellees.

Before CUMMINGS, CUDAHY, and POSNER, Circuit Judges.

POSNER, Circuit Judge.

The defendant, Mid–Continent Systems, appeals from a damages judgment entered upon a verdict for the plaintiffs (James Patton and R.L. Hildebrand, and their corporations) in a diversity breach of contract action. The jury awarded Patton and his company $592,000 in compensatory damages, and Hildebrand and his company $186,000. The jury also awarded the plaintiffs $2,250,000 in punitive damages, but the judge reduced this award to $100,000. Mid–Continent argues that it was entitled to a directed verdict on liability, that there was error in the jury instructions, that the compensatory damages were excessive, and that there was no legal basis for an award of punitive damages.

Mid–Continent provides a credit card that enables truck drivers to charge fuel and related expenses incurred at truck stops. In 1971 Patton, who operated a truck stop on Interstate Route 94 in Burns Harbor, Indiana, and Hildebrand, who operated a truck stop a few miles east on I–94 at New Buffalo, Michigan, entered into a franchise agreement with Mid–Continent. The agreement gave Patton and Hildebrand a specified territory, and authorized Mid–Continent to franchise additional truck stops in that territory only if the franchisees, upon being informed by Mid–Continent that additional coverage was required and upon being given the "first opportunity" to meet the requirement, failed to obtain the additional facilities needed.

In 1974 Mid–Continent franchised Truck–O–Mat, a truck stop located on I–94 west of the Patton and Hildebrand stops and just across the Illinois border; and beginning no later than 1976, Patton and Hildebrand complained to Mid–Continent that Truck–O–Mat's stop was in their territory, in breach of their franchise agreement. That is one of the alleged breaches; here is the other. In 1980 Mid–Continent decided it needed additional coverage in the territory occupied by Patton and Hildebrand, and so informed Patton in a letter that concluded, "We feel that a response within fifteen (15) days and a plan of action within thirty (30) days is reasonable." Two months later

Patton replied, "We are working with a real estate broker to establish the coverage that you think is not covered," but added, "Before we invest much more money into this project, I would like to know what you are going to do with the other fuel stop in our franchise area. Mr. Hildebrand and I complained to you, in your office, about this over three (3) years ago. At that time you agreed that it was indeed in our area. To our knowledge there still has been nothing done." Mid–Continent replied by acknowledging that Truck–O–Mat was in the plaintiffs' area and by offering to cancel Truck–O–Mat's franchise if and when the plaintiffs gave Mid–Continent the additional coverage that it desired. There was no immediate response; and seven weeks later (November 1980) Mid–Continent mailed Patton its "notification that you have been given 'right of first refusal' [and] . . . that I am now taking steps to fill this requirement." The "taking steps" involved Truckstops of America, which had opened a stop in Gary, Indiana (near Burns Harbor, the site of Patton's stop) in May 1980. Even before then, in April, the plaintiffs had seen a Mid–Continent sign lying on the ground at the Gary site and had complained to Mid–Continent, which had ordered Truckstops of America to get rid of the sign, and it did. No Mid–Continent credit cards were accepted at Truckstops' Gary stop until November 1980—when Mid–Continent franchised that stop in order to obtain the additional coverage that it wanted.

We begin our analysis with the franchising, allegedly in breach of the plaintiffs' franchise agreement with Mid–Continent, of Truck–O–Mat. The description of the plaintiffs' territory in their franchise agreement is ambiguous. Mid–Continent concedes that it was a question for the jury whether Truck–O–Mat's stop was in that territory, in which event the franchising of the stop violated the agreement, but argues that Patton's truck stop, at Burns Harbor, was not a franchised location. If this is right, Patton has no standing to complain about the invasion of his territory—he has no territory—even though the negotiating history makes perfectly clear

that Mid–Continent thought it was franchising two truck stops in the same territory, Patton's at Burns Harbor and Hildebrand's at New Buffalo.

The agreement recites that it is between Mid–Continent and "Richard L. Hildebrand & Jim Patton as individuals Corporation [sic], with its place of business at New Buffalo, Michigan." The agreement contains a "description of premises" which states only: "A full service truck stop located at intersection of I–94 at Wilson Road & M–239, New Buffalo, Michigan"—the location of Hildebrand's truck stop. There is no reference to Patton's truck stop at Burns Harbor. The agreement contains a standard parol evidence clause which, Mid–Continent argues, forbade judicial inquiry into the negotiating history.

■ When a contract is reduced to a writing intended to be the complete expression of the parties' agreement, the parol evidence rule is triggered and, in the event of a lawsuit, sharply restricts the admissibility of evidence concerning the negotiations leading up to the writing. See Farnsworth, Contracts § 7.2 (1982). Why this should be so is one of the common law's enduring puzzles. The traditional explanation for the rule, that it reflects a preference for written over oral evidence (see, e.g., *Franklin v. White*, 493 N.E.2d 161, 166 (Ind.1986); Charles T. McCormick, *The Parol Evidence Rule as a Procedural Device for Control of the Jury*, 41 Yale L.J. 365 (1932)), seems inconsistent with the fact that the rule makes evidence of prior negotiations inadmissible even if written. The traditional explanation also makes the rule redundant, since if a contract is clear "on its face"—that is, if any judge reading it without special knowledge concerning its background would extract the same meaning from it—"extrinsic" evidence, evidence outside the "four corners" of the written contract, is inadmissible to vary that meaning, independently of the parol evidence rule. See, e.g., *Amoco Oil Co. v. Ashcraft*, 791 F.2d 519, 521 (7th Cir.1986) (Indiana law); *Skrypek v. St. Joseph Valley Bank*, 469 N.E.2d 774, 777 (Ind.App.1984); *English Coal Co. v. Durcholz*, 422 N.E.2d 302,

308–09 (Ind.App.1981). Granted, the "four corners," "extrinsic evidence," and parol evidence rules are often run together, as in *American Fletcher National Bank & Trust Co. v. Pavilion, Inc.*, 434 N.E.2d 896, 904 (Ind.App.1982), vacated on other grounds, 453 N.E.2d 156 (Ind.1983). The first two rules seem identical; and *Hauck v. Second National Bank of Richmond*, 153 Ind.App. 245, 260, 286 N.E.2d 852, 861 (1972), describes the parol evidence rule as a "logical extension" of the "four corners" rule. But that should make one wonder whether the parol evidence rule might not have a separate function, beyond protecting contracting parties in advance from the uncertainty inherent in allowing a jury to range freely over testimony and revise the parties' deal to the jury's own liking; the other rules take care of that problem.

A somewhat more satisfactory explanation of the rule is that it expresses the parties' desire, in Professor Farnsworth's words, to "simplify the administration of the resulting contract and to facilitate the resolution of possible disputes by excluding from the scope of their agreement those matters that were raised and dropped or even agreed upon and superseded during the negotiations." Farnsworth, *supra*, § 7.2, at p. 451. It might appear that this ground, too, is traversed by the other rules—that testimony about the negotiations would be just another form of "extrinsic" evidence, or, equivalently, of evidence outside the "four corners" of the written contract. But there is more to it than this, since even if neither party denies that they came to an agreement during the negotiations, their subsequent action in signing a written contract intended to be the complete expression of their deal will make the prior agreement unenforceable.

One can argue that the garble in the description of the parties ("individuals Corporation") opened up this case to oral testimony for interpretive purposes only, a use that the parol evidence rule does not bar, at least if the written contract is ambiguous, see *id.*, § 7.12. This conclusion may seem inconsistent with the "integration" (i.e., no-parol-evidence) clause in the franchise agreement, but the position in Indiana is

that such "clauses, rather than operating to exclude evidence, are merely probative of the parties' intentions.... [T]he preliminary question of integration, either complete or partial, requires the court to hear all relevant evidence, parol or written." *Franklin v. White, supra,* 493 N.E.2d at 166–67.

But the ambiguity angle need not be pursued in this case, for what we have called the alternative explanation of the parol evidence rule disposes of any suggestion that the rule is applicable. Patton is not trying to burden Mid–Continent with obligations not assumed in the contract though perhaps discussed at the negotiating stage; he is merely trying to correct an oversight in drafting—the omission of his place of business. Mid–Continent does not argue that Patton and Hildebrand were joint venturers at the New Buffalo site; it does not argue that Patton had any interest in the site; it does not deny that Patton operated a truck stop in Burns Harbor and signed the franchise agreement in order to be able to honor the Mid–Continent credit card at his stop. It is merely trying to exploit a conceded mistake—its mistake, as the contract's drafter—in failing to list Patton's place of business. Commercial life in this country would slow perceptibly if harmless errors in the drafting of contracts were beyond judicial power to correct.

They are not; as was held in *Ligon Specialized Hauler, Inc. v. Hott,* 179 Ind.App. 134, 384 N.E.2d 1071, 1074–75 (1979), a case factually similar to the present one, the parol evidence rule does not prevent the reformation of a contract on grounds of mutual mistake. See also *Yarn Industries, Inc. v. Krupp International, Inc.,* 736 F.2d 125, 129 (4th Cir.1984); Farnsworth, *supra,* § 7.5, at pp. 471–72. Of course this is just a conclusion, but the reason for it flows easily from the alternative explanation for the parol evidence rule, although we confess that we do not find that explanation set forth in any opinion of an Indiana court. The rule gives expression to the parties' desire to replace any agreements they may have arrived at in preliminary negotiations with a definitive written contract. The parties here, having initially decided that Patton's truck stop would be franchised, did not then decide, when they came to the stage of writing up a definitive agreement, to delete his stop. On this point the writing is not the definitive agreement. Indeed, the written agreement lists Patton as a party to the contract, and he signed it.

It may seem that the parol evidence rule would be a practical nullity if a party were free to testify that, despite a parol evidence clause, the written contract was not complete, definitive, integrated, etc., because it mistakenly omitted a part of the parties' agreement. But since reformation is an equitable doctrine and, as noted in *Ligon* (see 384 N.E.2d at 1075), requires "clear and satisfactory proof" of mutual mistake (see also *Travelers Indemnity Co. v. Calvert Fire Ins. Co.,* 798 F.2d 826, 835 (5th Cir.1986), modified on rehearing on other grounds, 836 F.2d 850 (5th Cir.1988)), the danger of facile invocations of mutual mistake to get around the parol evidence rule is limited. The party alleging mutual mistake must convince the judge, and convince him clearly. That is no problem here; there is no doubt at all that the parties intended to franchise Patton's fuel stop as well as Hildebrand's. This is clear not only from the negotiations leading up to the signing of the franchise agreement and from the inclusion of Patton's name in it but from the parties' conduct afterward— and post-signing evidence is not excluded by the parol evidence rule in any event. See *Urban Hotel Management Corp. v. Main & Washington Joint Venture,* 494 N.E.2d 334, 338 (Ind.App.1986).

The other question on liability is whether Mid–Continent broke its contract with Patton and Hildebrand by failing to give them enough time to provide additional coverage in their territory. The contract does not say how long a franchisee has to comply with a notification that additional facilities are needed—how long its "first opportunity" lasts—but no options are forever, and a reasonable time can be assumed. *Barco Urban Renewal Corp. v. Housing Authority of City of Atlantic*

*City,* 674 F.2d 1001, 1007 (3d Cir.1982); *Schmidt v. McKay,* 555 F.2d 30, 35 (2d Cir.1977); cf. *Holbrook v. Pitt,* 643 F.2d 1261, 1274 (7th Cir.1981). The jury was entitled to believe the plaintiffs' evidence that a year to acquire a suitable site and another year to complete the truck stop on the site—two years in all—were not an unreasonable amount of time for compliance. Mid–Continent tacitly concedes that the question how long the plaintiffs should have to comply with its demand was a jury question by arguing that all it demanded was a "plan" (the word it used in its first letter) for compliance and that the plaintiffs plainly were unwilling to come up with a plan.

There is no doubt that the plaintiffs were being coy; Patton virtually told Mid–Continent that he would drag his feet until Mid–Continent cured the long-standing violation created by the franchising of Truck–O–Mat in the plaintiffs' territory. The coyness was understandable, however, with the Truck–O–Mat issue unresolved. Patton was naturally hesitant to provide additional coverage when he reasonably believed that Mid–Continent was franchising additional truck stops within the exclusive territory that he shared with Hildebrand—not only Truck–O–Mat but perhaps also Truckstops of America (remember the sign discovered back in April, months before the demand for additional coverage). This conduct by Mid–Continent created a danger that Patton might be unable to recoup his investment in the additional facilities that Mid–Continent wanted him to acquire.

Mid–Continent had acknowledged the Truck–O–Mat violation, and now it promised to cure it—but only if Patton would provide the additional coverage requested. The condition could be regarded as extortionate: Mid–Continent could not impose conditions on its undertaking to cure its own breach of contract. On the other hand, Patton does not argue that Mid–Continent's breach excused him from having to adhere to the conditions in the right of first refusal. The whole issue of contract conditions is a tangled one that, given Patton's concession, we shall not have to consider; what makes the issue particularly tricky

here is that Mid–Continent's breach did not *prevent* Patton from complying with his duty to provide additional coverage—the usual situation where the doctrine of contract conditions is invoked to excuse a failure of performance, see Farnsworth, *supra,* § 8.6—but did make that compliance riskier, since if Mid–Continent could not be depended on to adhere to the territorial provision in the franchise agreement Patton's chances of being able to recoup his investment in any new facilities would, as we have noted, be diminished.

With the issue of conditions out by virtue of Patton's concession, Patton is forced to acknowledge that he should have replied promptly to this offer, and if the jury had concluded that by failing to do so he forfeited his right of first refusal we presumably would not reverse. But this we need not decide. It was within the jury's discretion to conclude that Mid–Continent's action in announcing the forfeiture of the right of first refusal seven weeks after Patton wrote Mid–Continent that he was working with a real estate broker but wanted a resolution of the Truck–O–Mat violation was too peremptory in the circumstances to be consistent with the elastic terms of the franchise agreement.

■ That brings us to the damages questions. The first is whether the judge should have instructed the jury, as he did, that it could award compensatory damages for, among other things, any material misrepresentations by Mid–Continent. Mid–Continent argues that this was a breach of contract case, not a fraud case, and that by injecting the issue of misrepresentation the judge poisoned the jury's deliberations on liability. We cannot agree, while granting that the instruction was erroneous since the damages that the plaintiffs are complaining about flowed, at least proximately, from the franchising of their competitors Truck–O–Mat and Truckstops of America rather than from any misrepresentations. We cannot imagine that the jury was seriously confused, least of all about liability. And evidence of misrepresentations (primarily Mid–Continent's alleged assurances to the plaintiffs back in 1976, to which the

letter from Patton that we quoted earlier referred, that it would cure the Truck–O–Mat violation) was properly admitted in the case because it played a critical role in the plaintiffs' effort to obtain punitive damages.

We turn to the question whether the award of compensatory damages was so excessive in relation to the proof of harm that the verdict should be set aside and the case returned to the district court for a new trial on damages. We have expressed our concern in recent cases, see, e.g., *Empire Gas Corp. v. American Bakeries Co.*, 840 F.2d 1333, 1341–42 (7th Cir.1988); *Boxhorn Big Muskego Gun Club, Inc. v. Electrical Workers Local 494*, 798 F.2d 1016, 1022–23 (7th Cir.1986); *Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*, 797 F.2d 370, 382–83 (7th Cir.1986); *Ustrak v. Fairman*, 781 F.2d 573, 579 (7th Cir.1986), with the casualness with which parties sometimes approach the question of damages—too often treating it as a question appropriately answered (on the plaintiff's side) through the piling on of speculative possibilities imaginatively shaped by a compliant expert witness and (on the defendant's side) by nitpicking and sheer denial. We are not alone in the concern with irresponsible expert evidence on damages. See *In re Air Crash Disaster at New Orleans*, 795 F.2d 1230, 1234–35 (5th Cir.1986); cf. *Huddell v. Levin*, 537 F.2d 726, 743–44 (3d Cir.1976); *Nat Harrison Associates, Inc. v. Gulf States Utilities Co.*, 491 F.2d 578, 587–88 (5th Cir.1974).

The theory of damages in this case was that the franchising of competitors of Patton and Hildebrand, in violation of the franchise agreement, ate into the plaintiffs' profits. The theory was fine but the quantification lamentably deficient. To begin with, there was double counting. The plaintiffs' expert added to his estimate of lost profits the franchise fees, and the rentals, that the plaintiffs paid during the franchise period. The plaintiffs could have waived their damages remedy and sought restitution of the fees they had paid for

franchise rights that Mid–Continent violated, but they were not entitled to obtain both restitution designed to put them in the position they would have occupied had they never signed the franchise agreement and the profits they would have earned if Mid–Continent had never violated the agreement. If the agreement had never been signed the plaintiffs would have paid no franchise fees but would have had no profits from the agreement either, while if the agreement had never been broken the plaintiffs would have had profits but also would have had to pay franchise fees. Similarly, rental was an expense that the plaintiffs would have had to incur whether or not Mid–Continent observed the terms of the agreement; so it must be subtracted from the revenues they would have earned if there had been no breach of contract, in order to determine the profits they lost as the result of the breach.

Equally unavailing is the plaintiffs' argument that they should be entitled to recover their rental expense because their per-gallon rental rose as a result of Mid–Continent's breaches of contract. During the period for which the plaintiffs are claiming damages their lessor changed the terms of their leases from a per-gallon rental to a rental that did not vary with the amount of gasoline that the lessee sold. Insofar as Mid–Continent's breaches (particularly the franchising of Truck–O–Mat) caused the amount of gasoline that the plaintiffs sold to decline, the rental per gallon rose: a fixed rental was being spread over fewer gallons. All this is true but irrelevant to damages. If the franchise contract had not been broken the plaintiffs would have sold more gas and their per-gallon rental would have been lower, but the amount of rental would have been the same. Therefore damages equal to the lost profits on the gas not sold would place the plaintiffs in exactly the same position they would have occupied had there been no breach. To give them on top of those damages a rebate of their rental would make them better off than if there had been no breach.

Patton projected his damages from the franchising of Truck–O–Mat in his territory in 1976 by subtracting his net profit in 1977

($95,000) from his net profit in 1976 ($103,-000) and then multiplying the result ($8,000) by ten, the number of years until the franchise agreement expired. It was arbitrary to attribute the decline in Patton's profits to the franchising of Truck–O–Mat. Patton's sales on the Mid–Continent credit card grew dramatically between 1976 and 1977 (by 58 percent)—grew more than in any other year for which the record contains statistics. Patton argues that but for the franchising of Truck–O–Mat his sales on the credit card would have grown by more than 58 percent, but there is no evidence to support this unlikely conjecture.

In estimating the effect on his profits of Mid–Continent's action in franchising Truckstops of America's Gary stop, Patton used as his base year his fiscal year ending in November 1979, a year in which he had a substantial profit of $144,000. His profit the next year was much lower, and he attributed the difference to the franchising of Truckstops of America's Gary stop. But since that stop did not begin using the Mid–Continent credit card until November 1980—the end of Patton's 1980 fiscal year —the franchising of the stop could not have caused the sharp drop in Patton's profits between 1979 and 1980. Truckstops may have briefly displayed a Mid–Continent logo earlier in 1980 (though all that the record shows is that a sign with the logo was seen lying on the ground), but the mere display of the sign could not have eaten into Patton's sales at a time when Truckstops was not even open for business, let alone accepting the Mid–Continent credit card.

Hildebrand closed his truck stop in 1983, allegedly because of the franchise violations. His estimate of the profits he would have earned in the subsequent three years (that is, up to the time of trial) had he stayed in business is (three times) the average wage of a truck-stop manager ($48,000 per year) minus what Hildebrand earned after the truck stop closed and he went into the lawn-maintenance business. The question, however, is not what the average truck-stop manager would have earned but what R.L. Hildebrand would have earned,

and this may well have been lower since otherwise why did he not get a job as a truck-stop manager after he closed his own stop?

The question regarding punitive damages is not the amount after the judge cut down the jury's verdict, but whether the plaintiffs were entitled to any punitive damages at all. The franchise agreement states that Arkansas law shall govern any dispute arising out of the agreement but the district judge ruled that, because the case had been brought in Indiana, the law of Indiana governed all substantive issues.

■ The law to be applied in a diversity case is the law that would be applied by the state courts in the state where the suit is brought; thus one starts with the forum state's rule on choice of law and ends with whatever law that rule makes applicable to the case at hand. *Casio, Inc. v. S.M. & R. Co., Inc.,* 755 F.2d 528, 530–31 (7th Cir. 1985). Under this approach, the question would be whether Indiana would enforce a stipulation in the contract that Arkansas law shall govern all questions arising out of the contract, including the question of the standard for awarding punitive damages in the event of a breach. The norm is to enforce contractual stipulations of choice of law. See, e.g., *Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc.,* 507 N.E.2d 588, 597 (Ind.App.1987); *Sheldon v. Munford, Inc.,* 660 F.Supp. 130, 134–35 (N.D.Ind.1987). And since parties to contracts are permitted to specify the remedies that shall be available to them in the event of a breach, see, e.g., UCC § 2–719(1)(b); *Consolidated Data Terminals v. Applied Digital Data Systems, Inc.,* 708 F.2d 385, 392 (9th Cir.1983), since punitive damages were sought and awarded here as a remedy for a breach of contract rather than for a tort, and since the effect of stipulating which state's law would apply was, if not to specify, then at least to constrain, the available remedies, an argument could be made that Arkansas law should have determined the plaintiffs' entitlement to punitive damages. However, *Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc., supra,* can

be cited on either side of this question: compare 507 N.E.2d at 612 with *id.* at 617. And there is authority that in Indiana the law of the forum (in this case Indiana) governs remedial issues. See *Prudence Life Ins. Co. v. Morgan,* 138 Ind.App. 287, 292, 213 N.E.2d 900, 904 (1966); *Lincoln National Life Ins. Co. v. NCR Corp.,* 772 F.2d 315, 320 (7th Cir.1985). However, we did not apply the law of the forum in *Bowles v. Zimmer Mfg. Co.,* 277 F.2d 868, 872 (7th Cir.1960), a case where Indiana was the forum state; the weight of authority elsewhere and the better view is that remedial issues are so bound up with substantive issues that they ought to be decided according to the same law that governs the substantive issues, see, e.g., Leflar, American Conflicts Law § 126 (3d ed. 1977); and the principle (if it is a principle, even in Indiana) might in any event be overridden by the competing principle that contractual stipulations of choice of law will be honored.

 We need not opine further on this interesting question. Mid–Continent acquiesced in the judge's ruling that Indiana law applied; and the question is therefore waived on appeal. Although under Arkansas law the victim of a breach of contract cannot obtain punitive damages without proving that the breach was tortious, see *L.L. Cole & Son, Inc. v. Hickman,* 282 Ark. 6, 665 S.W.2d 278 (1984); *Delta Rice Mill, Inc. v. General Foods Corp.,* 763 F.2d 1001, 1006 (8th Cir.1985); *McLeroy v. Waller,* 21 Ark.App. 292, 731 S.W.2d 789 (1987), there is no such requirement under Indiana law, but under that law he must demonstrate his entitlement to punitive damages by clear and convincing evidence, see *Travelers Indemnity Co. v. Armstrong,* 442 N.E.2d 349, 358–65 (Ind. 1982); *Rose Acre Farms, Inc. v. Cone,* 492 N.E.2d 61, 69 (Ind.App.1986). Mid–Continent was eager to place this burden on the plaintiffs, and that is apparently why on balance it preferred to have the issue of punitive damages decided under Indiana law, and therefore acquiesced in the judge's ruling.

 Indiana allows punitive damages to be awarded in suits for breach of contract if, "mingled" with the breach, are "elements of fraud, malice, gross negligence or oppression." *Travelers Indemnity Co. v. Armstrong, supra,* 442 N.E.2d at 359; see also *Rose Acre Farms, Inc. v. Cone, supra,* 492 N.E.2d at 70; *Indiana & Michigan Electric Co. v. Terre Haute Industries, Inc., supra,* 507 N.E.2d at 610–12; *Canada Dry Corp. v. Nehi Beverage Co.,* 723 F.2d 512, 524–26 (7th Cir.1983). In trying to give concrete meaning to these terms (especially "oppression"), it is important to bear in mind certain fundamentals of contractual liability. First, liability for breach of contract is, prima facie, strict liability. That is, if the promisor fails to perform as agreed, he has broken his contract even though the failure may have been beyond his power to prevent and therefore in no way blameworthy. The reason is that contracts often contain an insurance component. The promisor promises in effect either to perform or to compensate the promisee for the cost of nonperformance; and one who voluntarily assumes a risk will not be relieved of the consequences if the risk materializes. See *Field Container Corp. v. ICC,* 712 F.2d 250, 257 (7th Cir.1983); *Fidelity & Deposit Co. v. City of Sheboygan Falls,* 713 F.2d 1261, 1269–70 (7th Cir.1983).

Even if the breach is deliberate, it is not necessarily blameworthy. The promisor may simply have discovered that his performance is worth more to someone else. If so, efficiency is promoted by allowing him to break his promise, provided he makes good the promisee's actual losses. If he is forced to pay more than that, an efficient breach may be deterred, and the law doesn't want to bring about such a result. See *J. Yanan & Associates, Inc. v. Integrity Ins. Co.,* 771 F.2d 1025, 1034 (7th Cir.1985). Suppose that by franchising Truck–O–Mat in the plaintiffs' territory, Mid–Continent increased its own profits by $150,000 and inflicted damages of $75,000 on the plaintiffs. That would be an efficient breach. But if Mid–Continent had known that it would have to pay in addition to compensatory damages $100,000 in puni-

tive damages, the breach would not have been worthwhile to it and efficiency would have suffered because the difference between Mid–Continent's profits of $150,000 and the plaintiffs' losses of $75,000 would (certainly after the plaintiffs were compensated) represent a net social gain.

Not all breaches of contract are involuntary or otherwise efficient. Some are opportunistic; the promisor wants the benefit of the bargain without bearing the agreed-upon cost, and exploits the inadequacies of purely compensatory remedies (the major inadequacies being that pre- and post-judgment interest rates are frequently below market levels when the risk of nonpayment is taken into account and that the winning party cannot recover his attorney's fees). This seems the common element in most of the Indiana cases that have allowed punitive damages to be awarded in breach of contract cases; see the discussion of cases in *Travelers Indemnity Co. v. Armstrong, supra,* 441 N.E.2d at 359. Granted, this is not how the legal test is phrased; in particular the category of "gross negligence" seems unrelated to opportunistic breach. We may have captured the core of the Indiana rule but missed the periphery. But whatever the exact dimensions of the rule, the facts of the present case are pretty clearly outside it.

There is no evidence that the action of Mid–Continent in franchising Truck–O–Mat in the plaintiffs' exclusive territory was opportunistic or even deliberate. So far as can be discerned from the record it was an honest mistake resulting from the ambiguous description of the territory in the franchise agreement with the plaintiffs. However, Mid–Continent's failure to correct the violation year after year after the plaintiffs had called its attention to it—even after it acknowledged the violation—converted an innocent breach into a deliberate one; but no clear and convincing evidence enables the breach to be characterized as malicious, fraudulent, oppressive, or even grossly negligent. As we saw in discussing the issue of compensatory damages, the breach did little, perhaps no, damage to either plaintiff, and it is there-

fore quite possible that it was an efficient breach in the sense that it increased Mid–Continent's profits by more than it caused anyone losses. If so, the refusal to rectify the breach, while deliberate, would not justify an award of punitive damages. See *J. Yanan & Associates, Inc. v. Integrity Ins. Co., supra,* 771 F.2d at 1034. Mid–Continent's unfulfilled promises to rectify the breach could be viewed as a form of deceit designed to prevent the plaintiffs from resorting to legal remedies, but this is just the kind of conjecture that seems excluded by the requirement of proving entitlement to punitive damages by clear and convincing evidence.

We find no evidence at all that Mid–Continent's action in franchising Truckstops of America after terminating the plaintiffs' right of first refusal was willful, considering that the franchise agreement with the plaintiffs failed to specify the period for which the right must be extended. There is little enough evidence that Mid–Continent was in breach of the agreement; there is none that the breach was wrongful in the strong sense required for an award of punitive damages under Indiana law.

The award of punitive damages must be vacated. The finding of breach of contract is affirmed and the case remanded for a new trial limited to compensatory damages.

AFFIRMED IN PART, VACATED IN PART, REMANDED.