v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 65A05–0309–JV–433.

Court of Appeals of Indiana.

April 6, 2004.

Jean E. Hadley, Mt. Vernon, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Andrew A. Kobe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

B.B. appeals the juvenile court's order directing him to register as a sex offender with the local sheriff. We reverse.

### Issue

The sole restated issue is whether the juvenile court conducted an evidentiary hearing from which it could have found clear and convincing evidence that B.B. was likely to commit another sex offense.

### Facts

B.B. was born in 1986. His first contact with the juvenile system was in 1997, when he was referred to an informal adjustment program for having committed animal cruelty. In 2000, B.B. admitted to again committing animal cruelty. He was formally adjudicated a delinquent this time and was placed on probation. A psychological evaluation performed prior to disposition on this charge stated:

> there are specific patterns of behavior which, if not curbed, will lead to a host of long term interpersonal and social consequences.... His history of multiple acts of participating in or witnessing animal cruelty strongly suggest[s] an inability to empathize with other living beings and gives witness to the fact that, if not corrected or better socialized, his behavior could develop in a much more antisocial bent.

App. pp. 107–08.

On January 2, 2001, the State filed a petition alleging B.B. molested a five-year old boy by fondling him, a Class C felony if committed by an adult, in June or July of 2000. B.B. denied committing this act, but the allegation was found true following a fact-finding hearing in September 2001. B.B. was psychologically evaluated again before final disposition; the ensuing report stated that testing results "strongly suggest a pattern of antisocial behavior, serious lack of empathy, and increasingly prominent emotional factors that will likely lead to a personality disorder if left unchecked. [B.B.] is in immediate need of intensive services." App. p. 99. On November 28, 2001, as part of the final disposition, the juvenile court ordered B.B. to be placed with White's Institution for Boys, a private residential facility.

While at White's, B.B. attended three sex offense group counseling sessions per week and also attended individual counsel-

ing. Reports from White's in the record before us generally reflect that B.B. was well behaved, did well in school, and was progressing in his treatment, especially after he admitted to counselors and his parents that he had molested the five-year old. There is also no evidence in the record that B.B. engaged in any delinquent behavior after the molesting incident in the summer of 2000. However, the White's staff was concerned that B.B. engaged in "sneaky and manipulative behavior" to cover up "mischievous but not always serious" incidents that involved only him and not other residents, such as changing his pants in a hallway. App. p. 62. Additionally, the White's staff was disappointed that B.B., on advice of counsel and pursuant to a court order, refused to take a polygraph test, which was part of White's standard treatment protocol. The reports also indicate that White's planned to recommend B.B.'s release in the summer of 2003.

After conducting a review hearing in June 2003, the juvenile court ordered B.B.'s release from White's. He was placed on probation and electronic monitoring; the juvenile court also ordered home-based counseling for B.B. and his parents. On July 18, 2003, the juvenile court, acting ex parte and sua sponte, issued an order requiring B.B. to register with the Posey County Sheriff's Department as a sex offender. In its order, the court stated that its decision was based upon a discharge summary received from White's indicating that B.B. "did not successfully complete sex offender treatment." App. p. 48. This discharge summary is not in the record before us, nor is there any indication in the chronological case summary ("CCS") that it was filed with the juvenile court.

B.B. promptly moved for a hearing regarding this order, which was set for Au-

gust 13, 2003. The hearing was primarily a discussion between the juvenile court, B.B., his counsel, and his parents. The State presented no evidence and made no argument, aside from clarifying that B.B. was fourteen at the time of child molestation. B.B.'s counsel argued, and the juvenile court essentially agreed, that it was unfair to base the sex offender registration order solely on the White's discharge summary because the finding that he had not successfully completed treatment was based primarily on B.B.'s refusal to take the polygraph test, pursuant to the advice of counsel and a specific court order. Nevertheless, the court reaffirmed its order requiring B.B. to register as a sex offender, based on the psychological evaluations performed before he was sent to White's. B.B. now appeals the sex offender registration order.

### Analysis

Before a juvenile who has been adjudicated delinquent for committing a sex offense may be ordered to publicly register as a sex offender, a court must find by clear and convincing evidence that the juvenile is likely to commit another sex offense. *See* Ind.Code § 5–2–12–4(b)(3). We have consistently construed this statute as requiring an evidentiary hearing before a juvenile may be ordered to register as a sex offender. *See, e.g., In re G.B.,* 709 N.E.2d 352, 354 (Ind.Ct.App.1999). Additionally, our standard of review of a decision to place a juvenile on a sex offender registry requires that we neither reweigh the evidence nor judge the credibility of the witnesses, and that we determine whether any reasonable fact finder could find the elements of Indiana Code Section 5–2–12–4 to have been proven by clear and convincing evidence. *R.G. v. State,* 793 N.E.2d 238, 240 (Ind.Ct.App.2003), *trans. denied.* It is impossible to apply this standard if there has not been a hearing at

which evidence and testimony was presented.

■ This is especially true with respect to a finding that must be supported by clear and convincing evidence. That standard "requires a stricter degree of proof than a mere preponderance of the evidence." *K.J.P. v. State*, 724 N.E.2d 612, 615 (Ind.Ct.App.2000), *trans. denied.*

> [C]lear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals to prove willful, wrongful and unlawful acts to justify an exceptional judicial remedy. . . .

*Id.* at 615–16 (quoting *Estate of Reasor v. Putnam County*, 635 N.E.2d 153, 159–60 (Ind.1994) (quoting *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 360–61 (Ind.1982))).

We discussed the difference between the adult criminal justice system and the juvenile delinquency system in *G.B.*:

> The statutory scheme for dealing with minors who commit crimes is vastly different from the statutory scheme directed to adults who commit crimes. *C.W. v. State*, 643 N.E.2d 915, 917 (Ind.Ct. App.1994). "American society [has] rejected treating juvenile law violators no differently from adult criminals in favor of individualized diagnosis and treatment." *State ex rel. Camden v. Gibson Circuit Court*, 640 N.E.2d 696, 697 (Ind. 1994). Therefore, it is the policy of this State to "ensure that children within the juvenile justice system are treated as persons in need of care, protection, treatment, and *rehabilitation* . . . ." Ind. Code § 31–10–2–1(5) (emphasis added); *see also B.L. v. State*, 688 N.E.2d 1311,

1314 (Ind.Ct.App.1997) (the "[S]tate's primary interest [is] in the rehabilitation, rather than the punishment, of juvenile delinquents.") (emphasis added).

709 N.E.2d at 354.

We also observe that in *Spencer v. O'Connor*, 707 N.E.2d 1039 (Ind.Ct.App. 1999), *trans. denied*, this court concluded that requiring an adult criminal sex offender to place his or her name on the sex offense registry is not a "punishment" within the meaning of the Ex Post Facto clauses of the United States and Indiana Constitutions. In so doing, we emphasized that much of the information contained in the registry with respect to adult criminal offenses is already in the public domain and is already accessible to the public. *Id.* at 1044. Also, to the extent registered offenders were sometimes subjected to vigilante acts, we observed that such incidents "are not consequences imposed by the [Registry] Act itself, but flow from the fact of the underlying criminal act." *Id.* at 1046. The identity of juvenile delinquents, however, is often not a matter of public knowledge because of the underlying policy of rehabilitating, not punishing, juveniles. *See* I.C. 31–39–1–2 (providing for general confidentiality of juvenile records, subject to delineated exceptions). We also acknowledged in *Spencer* "that the indirect effects of notification on the offenders and their families may be harsh" and "may include lost employment opportunities, housing discrimination, threats, and violence." *Spencer*, 707 N.E.2d at 1045.

■ In light of these considerations and the general policy of rehabilitation underlying the juvenile delinquency system, it is clear that there must be an inquiry at a full evidentiary hearing before a juvenile may be placed on the sex offender registry. Additionally, we have held that when a juvenile is placed in a secure

facility, a sex offender registry hearing can only be conducted after the juvenile has been released from the facility. *G.B.*, 709 N.E.2d at 354; *see also* I.C. 5–2–12–4(b)(2) (defining sex offender as including a juvenile who has been discharged from a Department of Correction facility, secure private facility, or juvenile detention facility). "This statutory scheme helps insure that juveniles who have been rehabilitated by virtue of their detention are not required to register as a sex offender." *G.B.*, 709 N.E.2d at 354. Thus, the focus of inquiry, with respect to a juvenile who has been released from a secure facility, is whether the treatment received in that facility has resulted in the juvenile's rehabilitation. If that is the case, there cannot be clear and convincing evidence that the juvenile is likely to re-offend and the juvenile cannot be placed on the sex offender registry.

Here, the State argues that the August 13, 2003 hearing conducted by the juvenile court was sufficient to meet the evidentiary hearing requirement because B.B. could have presented evidence at that time to persuade the juvenile court to keep him off the sex offender registry.[1] This argument misses the point. B.B. was not required to persuade the juvenile court to keep him off the registry; rather, Indiana Code Section 5–2–12–4(b)(3) clearly contemplates that the State bore the burden of proving, by clear and convincing evidence, that B.B. was likely to commit another sex offense. The State presented no evidence or argument to the juvenile court on this issue.

Instead, the juvenile court relied primarily on psychological examinations of B.B. conducted in 2000 and 2001, prior to his dispositions for the animal cruelty and child molestation charges, respectively, and prior to his rehabilitative treatment.

We are able to review these reports because they were attached to the 2000 and 2001 predispositional reports that were filed with the juvenile court and, therefore, they are included in the appendix B.B. provided to this court. However, we cannot conclude that these reports are sufficient, in and of themselves, to provide clear and convincing evidence that B.B. is likely to commit another sex offense. Although they do indicate that B.B. had moderate to severe psychological problems when they were prepared, they do not indicate that B.B. was beyond rehabilitation. For example, although the juvenile court said it was troubled by a statement in the 2000 report that B.B.'s "prognosis for change is poor," the words immediately before that statement are "If left unchecked...." App. p. 108. Similarly, the 2001 report stated that B.B.'s psychological issues "will likely lead to a personality disorder *if left unchecked.*" App. p. 99 (emphasis added). The report went on to recommend B.B.'s long-term placement in a secure facility to address his psychological problems.

This is precisely what B.B. received: approximately a year and a half of intensive treatment in a secure residential facility. His psychological problems were not "left unchecked." Thus, there needed to be an evaluation of whether that period of treatment sufficiently rehabilitated B.B. and whether he was likely to commit another sex offense. This is where the lack of a full evidentiary hearing on this issue has made it impossible for us to conclude that there is clear and convincing evidence B.B. is likely to re-offend.

As mentioned, aside from the 2000 and 2001 psychological reports, the juvenile

---

1. The State does not address whether the juvenile court's July 18, 2003 registration order was proper. Clearly, it was not because it was issued with no notice to B.B. and no opportunity for a hearing of any kind.

court relied upon a discharge summary from White's that purportedly stated B.B. had not successfully completed sex offender treatment. The problem is that this report, which we assume was prepared after B.B. was released from White's following the June 2003 review hearing, is not in the record before us. We do not know how it came into the juvenile court's possession. There is no indication in the CCS that it was ever filed with the court, nor was it entered into evidence as an exhibit at the registry hearing. Thus, we cannot review it or rely on the juvenile court's characterization of it in our decision. *See Frye v. Vigo County,* 769 N.E.2d 188, 194 n. 5 (Ind.Ct.App.2002) (noting that we cannot consider matters outside the record or speculate as to the actual facts of a case).

On appeal, however, the State also asserts B.B.'s progress reports from White's provide clear and convincing evidence that he is likely to re-offend, even though it did not introduce these reports at the August 13 hearing. These reports from White's that were filed and are in the record[2] generally note that B.B. was progressing in his therapeutic treatment and was generally well-behaved. For example, a report from October 2002 contains the following comments from the case manager:

> [B.B.] is a very bright young man. He appears to be able to control his behavior and take responsibility for his actions. On the surface he appears to be confident, sometimes overly confident. He demonstrates adequate social skills among his peers. Although doing well in most areas, I think that [B.B.] is capable of putting forth a better effort, especially in his counseling.

App. p. 46. This same report also states B.B. earned an average of 191 points out of 210 per week for good behavior in the facility, "a high level of points for our program." App. p. 44. Additionally, B.B. received an average of 121 out of 150 possible points per week in his individual counseling sessions. The only significant concerns in this report are B.B.'s refusal to take a polygraph exam as part of his treatment, which counsel advised him not to do and which the juvenile court ordered he did not have to do, and his "lying to staff to get out of trouble." *Id.*

■ Reports from January and March of 2003 are much the same, although they do not specifically mention the polygraph issue. They point toward B.B.'s release in the spring or summer of 2003, as eventually occurred, without indicating that White's was inclined to release him because of a failure to progress in treatment. They refer to his overall good behavior but still note his "sneaky and manipulative" behavior concerning "usually mischievous but not always serious" incidents that did not involve other residents. There is no indication of what "serious" incidents occurred and no evidence or mention of inappropriate sexual behavior, or anything else that might be considered criminal or delinquent behavior. This includes not only his time at White's, but also extending back to the 2000 molestation incident. There is no evidence of other inappropriate sexual behavior either before or after that incident. *Cf. R.G.,* 793 N.E.2d at 239–40 (finding sufficient evidence to support registration order where, inter alia, juvenile was "sexually inappropriate" with three peers while in treatment facility and during treatment disclosed having had twenty-one previous sexual partners, including three children

---

2. These reports were attached to review hearing reports prepared by the probation department.

and one passed-out woman). There is also no expert opinion evidence in the record that B.B. was likely to re-offend despite his treatment at White's. *Cf. M.L.H. v. State,* 799 N.E.2d 1, 3 (Ind.Ct.App.2003), *trans. denied,* (finding sufficient evidence to support registry order where four experts testified that juvenile was at high risk to re-offend); *R.G.,* 793 N.E.2d at 239–40 (also noting expert ·opinion, prepared on discharge from secure facility, that juvenile had "demonstrated pedophilic interests" and was at high risk for recidivism); *K.J.P.,* 724 N.E.2d at 616 (finding sufficient evidence to support registration order after noting testimony of two experts at registration hearing that juvenile was at high risk to re-offend).[3]

Under the circumstances, even if we were to assume without deciding that the August 13, 2003 hearing was an adequate sex offender registry hearing and that the juvenile court could rely on materials in the court's official record even if they were not admitted into evidence at that hearing, the record before us lacks clear and convincing evidence that B.B. is likely to commit another sex offense. We know that psychologists deemed him to be troubled before he entered White's, but we also know that overall he was cooperative while he was there, participated in extensive treatment there for almost a year and a half, and apparently never acted out sexually except for the one fondling incident in 2000. B.B.'s behavior and cooperation might not have been perfect while at White's, but·we do not think that absolute perfection in all respects is required before a juvenile can be deemed sufficiently rehabilitated so as to be unlikely to commit another sex offense. To conclude other-

wise would contravene the spirit and letter of the juvenile code generally and, specifically, Indiana Code Section 5–2–12–4(b).

**Conclusion**

We reverse the order requiring B.B. to register as a sex offender. Our decision today would not preclude the State from successfully requesting that B.B. be placed on the sex offender registry, provided it presents evidence at a hearing that establishes by clear and convincing evidence that B.B. is likely to commit another sex offense. Unless and until that happens, however, B.B.'s name must be removed from the sex offender registry.

Reversed.

KIRSCH, C.J., and FRIEDLANDER, J., concur.

---

**3.** There is no express requirement that expert testimony regarding a juvenile's likelihood of re-offending must be present in order to require the juvenile to be placed on the sex offender registry. However, such testimony is very helpful in meeting the clear and convincing evidence standard.