## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 07 2019, 8:15 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Timothy E. Stucky
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Custody of:

T.G. (Minor Child) and by

J.D. (Father),

*Appellant-Respondent,*

v.

M.G. and D.G., and

Indiana Department of Child Services,

*Appellees-Petitioners*

March 7, 2019

Court of Appeals Case No.
18A-JC-1906

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

The Honorable Sherry A. Hartzler, Magistrate

Trial Court Cause Nos.
02D08-1506-JC-235, 02D07-0602-JP-213

**Altice, Judge.**

## Case Summary

[1] J.D. (Father) appeals the trial court's order modifying custody of T.G. (Child) to M.G. (Maternal Grandfather) and D.G. (Maternal Step-Grandmother) (collectively, Grandparents). Father presents three issues for our review, one of which we find dispositive: Did the court err in concluding that Grandparents are the de facto custodians of Child?

[2] We reverse and remand.

## Facts & Procedural History

[3] Mother gave birth to Child on July 7, 2004.[1] On June 28, 2006, Father was adjudicated the biological father of Child, and Mother was awarded legal custody. On or about April 28, 2015, Mother was evicted from her residence. On May 9, 2015, Grandparents reported to the Department of Child Services (DCS) that Mother used drugs or illegal substances and had left Child in their care. On May 21, 2015, Mother submitted to a drug screen that was positive for heroin. On or about June 2, 2015, Mother travelled to California and reported that she did not know when she would return to Indiana. Given the circumstances, on June 8, 2015, DCS filed a petition alleging Child to be a child

---

[1] Mother had two more children, A.G., born on July 17, 2006, and Ai.G., born on March 13, 2009. The biological father of these children consented to the change of custody to Grandparents. Accordingly, we will set forth the facts herein as they relate to Child.

in need of services (CHINS) due to Mother's inability to provide necessary care resulting from her housing instability and drug use. Following a hearing, the court determined Child was a CHINS and ordered Child be placed in the care of Grandparents. DCS filed an amended petition on June 18, 2015, in which it alleged that due to his current incarceration in the State of Florida,[2] Father was unable to provide housing or financial support for Child.

[4] Following a dispositional hearing held on July 7, 2015, the court issued an order setting forth Father's obligations under a parental participation plan. Specifically, Father was to maintain suitable housing, obtain employment, provide Child with appropriate clothing, submit to a diagnostic assessment and follow all recommendations, cooperate with the rules of Child's placement, and participate in supervised visitation, among others. Father was also ordered to pay child support in the sum of forty-one dollars per week. The court ordered that Child was to remain in the care of Grandparents.

[5] Father was released from incarceration in September 2015 and immediately contacted DCS. Father then returned to Indiana and willingly participated in services and visitation with Child. Following a review hearing in December 2015, the court noted that Father was participating in, but had not completed, court-ordered services. At that time, Father's visits with Child were conducted

---

[2] Father was incarcerated in Florida for five months. Although the timing is unclear, prior to his incarceration in Florida, Father spent four months at the Westville Correctional Facility in Indiana for a DUI conviction. At some point, Father also spent an unstated amount of time in federal custody for a drug conviction.

with "drop-in visits" from a service provider. *Appellant's Appendix* at 60. Father sought expansion of his visitation with Child, but Child's Guardian ad Litem (GAL) cautioned against such until the results of Father's diagnostic assessment were made available. The court did not expand Father's visitation, but ordered visitation to continue as already approved. Father was also ordered to "refrain from permitting [C]hild to have access to R-Rated, violent and T&M rated electronic games or activities." *Id.*

[6] After the results of his diagnostic assessment were complete and indicated no issues or areas of concern, Father again sought an increase in his visitation with Child. After a hearing on Father's request, the court expanded Father's visitation, ordering that Father have unsupervised visits with Child on Saturday and Wednesday evenings with drop-in visits by a service provider. Father was also ordered to not transport Child until he obtained a valid driver's license.

[7] Following a May 11, 2016 permanency hearing, the court noted that Father had continued to participate in and had "demonstrated an ability to benefit from services." *Id.* at 71. The permanency plan for Child was identified as reunification with Mother.

[8] The court held a review hearing on November 1, 2016. In its order, the court noted that Father was compliant with services and that claims that Father was using or possessing marijuana were unsubstantiated. The court noted that the permanency plan adopted in May was no longer appropriate as Mother had moved to California, had not maintained contact with DCS, had wholly failed

to comply with services, and had tested positive for illegal substances. With regard to visitation between Father and Child, the court granted Father unsupervised, alternate weekend parenting time with Child from Saturday at 9:00 a.m. to Sunday at 6:00 p.m. provided that: (1) family therapy continue; (2) Father complies with Child's individual therapy treatment plant; (3) Father is responsive to Child's need to participate in activities with his siblings during Father's parenting time; and (4) Father does not operate a vehicle with the Child without having received a valid driver's license.

[9] The court held a permanency hearing on January 11, 2017, during which the permanency plan for Child was changed from reunification with Mother to a change of custody to Grandparents. At the same time, it was noted that Father had continued to participate in court-ordered services, but that he had not been consistent in his visitation with Child. The court continued Father's visitation under the terms previously set.

[10] On April 19, 2017, DCS filed in the CHINS action a motion for permanency, change of custody, and joinder. In support thereof, DCS alleged that there had been a change of circumstances so substantial and continuing that a change of custody was needed. DCS also asserted that Grandparents were a necessary party to the case and requested that they be joined in the action. DCS submitted that during the preceding five years, Child had lived with Mother from April 2012 through June 5, 2015 and that from June 5, 2015 to present, Child had lived with Grandparents. Father obtained counsel on July 31, 2017.

[11] Following an October 4, 2017 permanency hearing, the court found that Father had regularly visited Child, but that he had not demonstrated an ability to maintain a consistent schedule with Child "in consideration of the [C]hild's diagnosis of Autism." *Id.* at 96. The court also found that it was "contrary to the welfare of the [Child] to be placed with the [Father]" and reaffirmed that the new permanency plan of granting custody of Child to Grandparents was in Child's best interest. *Id.*

[12] The court held a hearing with regard to DCS's request for a change of custody on November 13, 2017, and April 11, 2018. Via telephone, Mother consented to the change of custody to Grandparents and expressed her desire that Child remain with his siblings. Father contested DCS's request for change of custody to Grandparents. He requested that he be awarded legal custody of Child and proposed a shared physical custody arrangement, recognizing that Child would benefit from spending significant and meaningful time with his siblings and Grandparents.

[13] During the hearing, Brandi Haywood, the assigned DCS family case manager (FCM), testified that although there had been incidents in the past, she currently did not have any concerns about visitation between Child and Father and that she believed at times Child enjoyed the time he spent with Father. FCM Haywood testified, however, that despite Father's compliance and completion of court-ordered services, it was in Child's best interests to remain in Grandparents' home so that he could be with his siblings.

[14] The court-appointed GAL also acknowledged Father's compliance with court-ordered services and that Child desires to have a relationship with Father. She further testified that although Child enjoyed spending time with Father, he still desired to stay in the home of Grandparents. It was her opinion that it was in Child's best interests to award custody to Grandparents and grant Father visitation. Her opinion was based on Child's close bond with his siblings, that Grandparents were providing Child with the structure he needed, and that Father seemed unaware of Child's special needs.

[15] On July 19, 2018, the court issued a twenty-one page order with extensive findings of fact and conclusions of law. Specifically, the court found as follows:

> 7. The Court finds that . . . on June 28, 2006 [Father] was adjudicated the biological father of [Child] and Mother was awarded legal custody.
>
> * * *
>
> 13. The Court finds that at the time of [the CHINS] adjudication Mother was unable to provide care for [Child] as a result of housing instability and drug use.
>
> 14. The Court finds that at the time of [Child]'s placement Father . . . was incarcerated in the State of Florida for distribution of cocaine.
>
> * * *

16.  The Court finds that [Child was] placed in the care of Maternal Grandfather . . . and Maternal Step Grandmother . . . on or about July 5, 2015.

* * *

22.  Through Mother's testimony the Court finds that Mother desires to have all three children remain together in the placement of [] Grandparents and contends it is in all three children's best interests to remain in the home.

* * *

25.  The Court finds that at the time of these proceedings, [Child] and his siblings had lived continuously in the care of [Grandparents] since July 5, 2015.

* * *

28.  Over the course of [Child]'s life, he has never resided with his Father.

* * *

34.  The Court finds that in approximately March of 2018, [Father]'s visitations had expanded to alternate Fridays through Monday mornings at which time [Child] was to be dropped off at school in the morning.

35.  The Court finds that [Child] has special needs.  The parties agreed during the proceedings that the Court shall take judicial notice of the [DCS] May 2, 2016 report in which [DCS] summarizes as follows: "On August 4, 2015, [Child] completed a

Clinical Interview and Assessment with James Cates at Cates and Associates. Dr. Cates reported, "[Child] exhibits traits consistent with either a neuropsychological impairment, such as would occur with fetal alcohol effects, or an autism spectrum disorder. The most efficacious approach is a combined academic and personality assessment. Psychoeducational testing to determine his intellectual and academic strengths and weaknesses, completed by the school, combined with a personality assessment, complete [sic] by a DCS provider, would provide a comprehensive vies [sic] of his issues. At that point, the need for further, more extensive neurological and neuropsychological testing can be determined."

36. According to the May 2, 2015[3] Report, "On September 30, 2015, [DCS] submitted a personality testing referral to Cates and Associates. On November 11, 205 [sic], [Child] received a psychological assessment from Cates and Associates. The recommendations of the assessment are as follows: (1) Counseling (2) Consideration of and [sic] Individual Educational Plan (3) Placement Stability.

37. The Court finds that an Individual Educational Plan (IEP) has been instituted for [Child].

\* \* \*

39. The Court finds that [Child] will likely be changing schools if custody were awarded to his Father.

\* \* \*

---

[3] The report was actually issued on May 2, 2016.

42. [Child's therapist Grant] Gerard is providing therapy to assist [Child] with his emotions and the stress of uncertainty.

43. Through the testimony of Gerard, the Court finds that consistency and a routine are important for [Child]'s development. The Court further finds that [Child] experiences anxiety and frustration when encountered with unexpected events. The Court finds through the testimony of Gerard that he told Father that he needed to be more consistent and show up on time for his visitations. The Court finds that Father has contact [sic] Gerard on two occasions during the course of [Child]'s therapy.

44. Ultimately, Gerard contended that [Child] had improved but was still in a constant state of anxiety. Further Gerard contends that [Child] is strongly bonded with his siblings and happy and adjusted living with [G]randparents. Additionally, Gerard is very concerned about Father having slapped [Child] during his visitation as such cause [sic] [Child] significant anxiety.

45. The Court finds that [Grandparents] have been providing a consistent routine for [Child] in their home. The Court finds through the testimony of [Maternal Grandfather] that he assists [Child] with time management and behavior regulation.

* * *

53. The Court finds that Father acknowledges the bond between [Child] and his [G]randparents and siblings. Ultimately, Father proposes a shared physical custody award with Grandparents with Father being granted legal custody.

* * *

58. The Court finds that none of the parties dispute that [Child] wants to remain with his Grandparents and siblings. However, it is Father's contention that [Child]'s wishes are not dispositive on the issue of custody.

59. The Court further finds through Father's testimony that he has been employed since his release from incarceration doing concrete work for which he works a lot of hours in the summer.

*Appellant's Appendix* at 125-34.

[16] Based on these findings, the court made the following conclusions:

66. The Court concludes by clear and convincing evidence that [Maternal Grandfather] has served as the de facto custodian of [Child] as he has been the primary and exclusive custodians [sic] of child for three years prior to the initiation of the [CHINS] Proceedings.

\* \* \*

70. Further pursuant to Ind. Code 31-17-2-8.5, the Court concludes the following:

a. That [Grandparents] wish to provide primary care and supervision for [C]hild;

b. That [C]hild has been primarily cared for, nurtured, and supported by [Grandparents] since he was born.

c. That the Father did not provide primary care and supervision for [Child] as a result of his incarceration resulting from his criminal activity.

d.  The circumstances under which [C]hild was allowed to remain in the custody of [Grandparents] were due to Father's criminal activity and his inability/unwillingness to provide primary care and supervision.

\* \* \*

73.  The Court concludes that [Child] is currently thirteen (13) years of age; that Mother wishes for [Child] to be in the sole legal custody of [] Grandparents and Father wishes to have custody; that it is undisputed that [Child] wishes to live with [G]randparents; that [Child] is bonded to his siblings who will remain in the care of his Grandparents; that [Child] is bonded to his Grandparents with whom he has resided for nearly ½ of his life; that [Child] is adjusted to his Grandparent's home and his school at which he receives the benefit of an Individual Education Plan; that [Child] has special needs for which Father is ignorant and dismissive; that Father has inappropriately physically disciplined [Child] by slapping him in the face in contradiction of the care and routine required for his special needs; that Father has a prior criminal history of domestic battery; and that [Child] has been cared for by [Maternal Grandfather] who has been deemed a de facto custodian.

\* \* \*

76.  The Court further concludes that Father is not equipped to provide for the primary care and supervision of [Child].  Given Father's inability to handle the discipline of [Child] that resulting [sic] in Father striking [Child] in the face and Father's denial of the special needs of [Child] it would be contrary to his best interests to be placed in the primary care of his Father.

\* \* \*

> 81. The Court concludes that [C]hild is well adjusted and well cared for by [Grandparents]. The Court concludes that Father does not dispute this conclusion.

> 82. The Court concludes that it is in the best interests of [Child] for Grandparents to be awarded sole legal and physical custody of [Child].

*Id*. at 135-39. The court therefore awarded legal and physical custody of Child to Grandparents and granted Father parenting time in accordance with the Indiana Parenting Time Guidelines. The court also terminated Child's wardship under the CHINS proceedings. Father now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[17] We have been asked to resolve a custody dispute that centers around the tension between the rights of a natural parent and the interests of a third party who has been a stabilizing force in Child's life. Indeed, our legislature recognized that in certain situations it could be in a child's best interests to be placed in the custody of a third party rather than a natural parent. To that end, the legislature provided that where a third party meets the definition of a de facto custodian under Ind. Code § 31-9-2-35.5, he or she has standing to pursue custody of a child and indeed must be made a party to the custody proceedings. *In re Custody of G.J.*, 796 N.E.2d 756, 761 (Ind. Ct. App. 2003), *trans. denied*. The third party who is seeking custody must establish de facto custodian status by clear and convincing evidence. Ind. Code § 31-17-2-8.5(a). Only then can

the court consider the best interests of the child in the context of a custody determination.

[18] A "de facto custodian" is defined in relevant part as follows:

> "De facto custodian", for purposes of IC 31-14-13 [paternity cases], IC 31-17-2 [custody and visitation cases], and IC 31-34-4 [juvenile cases], means a person who has been the primary caregiver for, and financial support of, a child who has resided with the person for at least . . . one (1) year if the child is at least three (3) years of age.

> Any period after a child custody proceeding has been commenced may not be included in determining whether the child has resided with the person for the required minimum period. The term does not include a person providing care for a child in a foster family home (as defined in IC 31-9-2-46.9).

I.C. § 31-9-2-35.5. Father asserts, and the State agrees, that in determining whether Grandparents qualified as the de facto custodian of Child, the court could not consider that period of time after Child was placed in Grandparents' care pursuant to the court's July 5, 2015 placement order. Indeed, the parties agree that such placement was akin to placement in a foster family home.[4] Father thus argues that omitting this time period, Maternal Grandfather did not

---

[4] A foster family home is "a place where an individual resides and provides care and supervision on a twenty-four (24) hour basis to a child . . . who is receiving care and supervision under a juvenile court order or for purposes of placement." Ind. Code § 31-8-2-46.9.

establish by clear and convincing evidence that he was the primary caregiver for the requisite one-year period to prove his status as de facto custodian of Child.

[19] The clear and convincing evidence standard requires a stricter degree of proof than a mere preponderance of the evidence. *K.J.P. v. State*, 724 N.E.2d 612, 615 (Ind. Ct. App. 2000), *trans. denied*. "[C]lear and convincing proof is a standard frequently imposed in civil cases where the wisdom of experience has demonstrated the need for greater certainty, and where this high standard is required to sustain claims which have serious social consequences or harsh or far reaching effects on individuals." *Id.* (quoting *Travelers Indem. Co. v. Armstrong*, 442 N.E.2d 349, 360-61 (Ind. 1982)). When reviewing a judgment requiring proof by clear and convincing evidence, an appellate court may not impose its own view as to whether the evidence is clear and convincing, but must determine, by considering only the probative evidence and reasonable inferences supporting the judgment and without weighing the evidence or assessing witness credibility, whether a reasonable trier of fact could conclude that the judgment was established by clear and convincing evidence. *In re B.H.*, 770 N.E.2d 283, 288 (Ind. 2002).

[20] We must apply this standard while keeping in mind that Child custody determinations fall squarely within the discretion of the trial court and will not be disturbed except for an abuse of discretion. *Clark v. Clark*, 726 N.E.2d 854, 856 (Ind. Ct. App. 2000). Reversal is appropriate only if we find the trial court's decision is against the logic and effect of the facts and circumstances before the Court or the reasonable inferences drawn therefrom. *Id.*

[21]   We begin by noting the extensive findings entered by the trial court. The vast majority of the trial court's findings pertain to a best interest analysis. Indeed, it cannot be doubted that Grandparents (especially Maternal Grandfather) provide Child with the structure and stability he needs. Nonetheless, a best interest analysis is pertinent only after the court has determined that the third party seeking custody has established de facto custodian status by clear and convincing evidence. With regard to this determination, the court made the following findings:

> 26. The Court finds that prior to the initiation of the [CHINS] proceedings, Maternal Grandfather had been the primary care giver for [Child] for 7 out of [Child]'s 13 years. Specifically, [Child] resided with [Maternal Grandfather] from birth until he was two years old and for another year prior to the CHINS proceedings.

> 27. The Court finds that even when [Child] was residing with his Mother, the family resided in a rental home owned by [Maternal Grandfather] and that he continued to provide financial support for [Child] and Mother.

*Appellant's Appendix* at 127. In its conclusions regarding Grandparents' de facto custodian status, the court seemed to include that time period after Child was placed in Grandparents' care pursuant to the court's order. The parties agree this was improper. The only other evidence that suggests that Grandparents were Child's de facto custodians is that Child had resided with Maternal Grandfather for two years after he was born and for another undefined period of time prior to the instant proceedings. Father argues that these findings are

not supported by the evidence and, in any event, do not establish by clear and convincing evidence that Maternal Grandfather was the primary caregiver for Child during those periods of time.

[22] Having reviewed the record, we are constrained to agree with Father. At the hearing on the matter of custody, Maternal Grandfather testified that prior to court's July 5, 2015 order that placed Child in his and Maternal Grandmother's care, Child had resided with him at other times as well. Specifically, he testified that Child, who was thirteen years old at the time of the hearing, lived with him from the time Child was born until he was almost two years old. Maternal Grandfather also testified that Child lived with him for about a year approximately six months before Child was formally placed with him pursuant to the court's placement order. Maternal Grandfather testified further that Mother and Child lived with maternal grandmother at times and that they lived in one of his rental properties for about four years.

[23] The trial court made specific findings based on Maternal Grandfather's testimony in this regard. What is lacking however is testimony from Maternal Grandfather that he was the primary caregiver of Child during these periods of time or any other evidence in the record tending to show such to be the case. While there is no doubt that Maternal Grandfather has been present for much of Child's life, the evidence does not clearly and convincingly establish that Maternal Grandfather had been Child's primary caregiver.

[24] In short, we conclude that to establish de facto custodian status, the evidence must establish more than simply that the Child lived with the third party seeking custody for a period of time remote to the proceedings (i.e., from birth to two years of age when Child is now thirteen) or at some other unspecified time. Given the procedural posture of this case, in order for Grandparents to be awarded custody, they must have established themselves to be Child's de facto custodian by clear and convincing evidence. They did not do so. The trial court abused its discretion in concluding that Grandparents were the de facto custodians of Child. Because Grandparents lacked standing and could not be awarded custody, we remand to the trial court to reopen the CHINS action and reinstate DCS's wardship over Child.

[25] Reversed and remanded.

Najam, J. and Pyle, J., concur.